838 So.2d 413 (2002)
Willie B. SMITH III
v.
STATE.
CR-91-1975.
Court of Criminal Appeals of Alabama.
February 1, 2002.
Rehearing Denied March 15, 2002.
Certiorari Denied June 28, 2002.
*421 Ellen L. Wiesner, Brookfield, Wisconsin, for appellant.
Bill Pryor, atty. gen., and Cecil G. Brendle, Jr., asst. atty. gen., for appellee.
Alabama Supreme Court 1011228.

On Return to Remand
PER CURIAM.
The appellant, Willie B. Smith III, was convicted of capital murder for the intentional killing of Sharma Ruth Johnson during the course of a robbery and the intentional killing of Sharma Ruth Johnson during the course of a kidnapping. Following a sentencing hearing, the jury returned an advisory verdict of death, by a vote of 10 for death and 2 for life imprisonment without parole. A subsequent sentencing hearing was held before the trial court, and the appellant was sentenced to death by electrocution.
The trial court properly made the following findings of fact concerning the offense, which were contained in his sentencing order:
"The Defendant is a black male, age 22 at the time of trial, charged in an execution style shotgun slaying of Sharma Ruth Johnson, a 22-year-old white female abducted at gunpoint from an automatic teller site at a local bank.
". . . .
"Angelica Willis, also indicted for the capital murder of Ms. Johnson, testified in exchange for a plea to the lesser offense of murder and a twenty-five year sentence. Ms. Willis, age 17 at the time of the offense, stated that she was living with defendant Smith in October, 1991, that she and defendant left their apartment on foot at about midnight of October 26 to look for defendant's brother Lorenzo, were enroute to Pizza Hut [restaurant] and observed Ms. Johnson seated in her car at a First Alabama *422 Right Place automatic teller machine on Parkway East. Ms. Willis states that defendant Smith told her to approach the car and `ask the lady where Krystals [hamburger fast food restaurant] is', that she complied by going to the passenger side of the car, made the inquiry, that Ms. Johnson said she did not know the location of Krystals, that the defendant approached the car, pulled out a sawed-off shotgun, inserting the gun partly in the window and repeatedly demanded that the victim get out of the car; that Ms. Johnson got out of the car and was placed in the car trunk, that defendant drives the car some distance to Huffman, returns to the point of the abduction at the bank and locates Ms. Johnson's bank card on the ground.
"The victim is made to call out her secret code number from the trunk of the car and the approximate amount of money she had in her account, enabling Willis at defendant's instruction to receive some $80.00 from the automatic teller machine.
"Unknown to defendant Smith the bank video camera is taking his photograph while he is seated in the car directing Willis' activities. The time of day depicted in the photo frame is Sunday, October 27, 1991, 1:25 a.m.
"The film runs for about four minutes depicting defendant's face and special wearing apparel, Los Angeles Raiders cap, epaulets on shoulders of coat.
"The witness describes how defendant Smith embarked again driving victim's car with victim in the trunk and Willis in the front seat, the purchase of some gas at a Texaco station and locating Lorenzo at a shopping center in Huffman.
"The witness describes Lorenzo getting into the car and upon learning that the owner of the car is a female locked in the trunk taunts the victim with sexual overtures, i.e., `do you want to suck my ______.'
"The defendant and Willis manage to get Lorenzo to quiet down, a phone call is made to a Michael Wilson who is not in, witness then describes the trip to Zion Memorial Cemetery.
"Willis states that Smith said `I'm going to have to kill hershe'll call the police,' Willis states that she (Willis) protested but that Smith persisted that he would have to kill Ms. Johnson; that Smith directed Lorenzo and Willis to get away from the trunk in case the woman might jump out at them, that he proceeded to open the trunk, remarking to the victim `I'm going to have to kill you', that the victim promised that she would not tell the authorities, that Smith raises up the gun and she hears the report of the shotgun.
"Witness describes Lorenzo as stating `Willie had shot her in the head.'
"Next the threesome drive to north Roebuck and abandon the vehicle with Ms. Johnson's remains in the trunk. The next day Willis states that defendant Smith confided in her that he had gone back and burned the car to remove his fingerprints.
"Germane Norman testified that in early November she heard the defendant on the phone describing how he had `killed a white woman at the cemetery, had ridden around in her car and later burned the car.'
"The witness further describes defendant as saying that he was going to leave town.
"Latonya Roshell described how she met the defendant in November when defendant and Michael Wilson moved into her place; that Wilson stated to her that Willie needed a place to stay; that Smith stated that he had `got a white woman and shot herblowed her *423 brains outand got some money from her.'
"Roshell is a Hoover Police Department informant and upon confirming through news reports that Smith was telling the truth she called her contact at Hoover Police Department. The Hoover Police Department gets Birmingham Police Department involved and Ms. Roshell agrees to be `wired' with a body mike.
"Ms. Roshell, wearing a body mike and monitored by the police, engages in a dialogue with defendant Smith and though there is static and interference on the tape from airplanes, passing cars, radios, etc., defendant Smith is clearly heard to make a number of inculpatory statements.
"Redacted or `sanitized' tapes were played to the jury and the jury was provided a redacted transcript of the dialogue. Some of the actual dialogue between Roshell and Smith at tape # 1 side B beginning at page 4 of the transcript follows:
"`Smith: Now, now that's the only way he can help me, but as far as giving me some money, but it ain't never came down to it, really, really, really boil down to it, where I just have to go on and get out of town.
"`Roshell: Even, Jermaine was trying to get money from folks. She said me and Willie had our differences but I don't want to see him get fucked up over no bullshit like this, but ah what I'm saying, they followed y'all to the apartment.
`"Smith: Yeah.
"`Roshell: What I'm saying is this thing fucked up.
"`Smith: Yeah, it is fucked up boy, you know like I said earlier, it don't really matter to me.
"`Roshell: What I like to know, I mean, do you, I mean you can't trust everybody.
"`Smith: I can't trust everybody, only my, only person knows my brother, my brother he lives my brother worried about him, you understand?
"`Roshell: What he was with you?
"`Smith: Yeah, he was with me, my brother I ain't worried about him.
"`Roshell: Oh.
"`Smith: I ain't worried about him. And, and my cousin.
"`Roshell: Your cousin was with you?
"`Smith: Nah, not my cousin, but, he's my cousin, the one that went the next day when we burnt up the car, but I ain't worried about him. Because he helped me burn up that bitch, so my kin only know.
"`Roshell: That's why you, you didn't want your fingerprints on it.
"`Smith: Yeah, yeah.
"`Roshell: But you ain't been to jail for no damn murder have you? What makes you, make you, ... I/A ... if you ain't been to jail for murder. Like you running scared?
"`Smith: Right now, I ain't, I'm not on the run. I ain't on the run right now. What I was trying to do, I was trying to get my things away from Roebuck, period. You see what I'm saying, just in case, these white folks don't hardly like no black folks running there anyway. I walked through there with my gun, I had my hand on my gun like this and just in case they say, boom, and there he go, that is the one, you see what I'm saying? They going put a check on him. You see I don't want, I don't want to be around all that, see cause that's why I said I'd get away from the house for a couple of weeks, couple of months something *424 like that there, then my face wouldn't be seen from all these cars out in the clear. So you don't like that idea?
"`Smith: ... I/A ... (road traffic) (interference inside store, Pac Man [video-game] machine.) Unknown males talking in store.
"`Roshell: ... I/A ... I was thinking about this all last night I was like, I was just thinking. I don't know. I just thought like my nephew, he got shot at the Gallant Men, right `sic,' the dude that he, they was shooting each other for a fifth of ... I/A ... but he killed the dude, but that still bother Greg. Even though it was self-defense. Like you see, I can imagine how you feel. You know ... I/A. one hundred dollars?
"`Smith: One hundred dollars ... I/A... her brother was the police.
"`Roshell: So what's the thing, how did you find out her brother was the police?
"`Smith: `Cause when I got in her car, I looked at the pictures, she had her brother sitting right there. It said Johnson, his name was Officer Johnson and her name was Sharma Johnson, she got pictures right there.
"`Roshell: You remember her name and shit?
"`Smith: Yeah, I remember her whole name.
"`Roshell: How'd you kill her? Did you beat her to death or what?
"`Smith: All I did, all I did was, uh, I took her to the cemetery.
"`Roshell: And then you killed her in the cemetery?
"`Smith: I killed her in the cemetery right in Zion City. It's probably about 12 blocks, nawh, about 14 blocks from my house.
"`Roshell: From your house?
"`Smith: Yeah, about 14, about 15, 16 blocks from my house ... I/A ... (road noise).
"`Roshell: I don't know where you stay, so.
"`Smith: Yeah, anyway it's a good ways from my house, ... I/A ... (road noise).
"`Roshell: What you say, did she know you were going to kill her?
"`Smith: She didn't know. She just said here you can take the car. I was acting like this here. I was thinking don't shoot, don't do it. Her brother a police, no, if I let you go you going to fuck me up.
"`Roshell: Then what she say.
"`Smith: She said, no I'm not, I promise (mimicking a female voice). I said you a liar, boom, then shot her in the head with that gun.
"`Roshell: You shot her in the head with that gun in my house. That gun don't look like it would shoot no goddamn body. You shot her with that, Willie, damn! I was looking at that rusty motherfucker a few minutes ago.
"`Smith: I just fired it, I just ... I/A...
"`Roshell: Was her brains blowed all the way?
"`Smith: Like this here, her eye, everything just hung out. Ah, Ah her whole eye was just, just fell out.
"`Roshell: When she saw it, what'd you did?
"`Smith: She said, she said, no I ain't, like that, she said that. I touched her head, I said you're a motherfucking liar, Boom! And all this and then he slapped her, then we stopped, looked around, put the sawed off in my pocket, and I had my coat like this in case I saw some cars. I could just throw *425 that bitch, like that there. Hey, where are we going?
"`Roshell: Don't ask me, I'm just following your ass.
"`Smith: Like that there, and then I thought somebody saw me back there, I waited for a day. I said if nobody find that car today, that mean ain't too much looking for her. So, what I do, I'll go round there and burn that bitch up, get my fingerprints off of it. So, that's what I did. I burned that bitch slap off, I burned that bitch so bad that the car seat, you know that little... I/A ... part.
"`Roshell: Uh huh.
"`Smith: That the iron part showing and all the steel in the wheel.
"`Roshell: Was she burnt up in it too?
"`Smith: Nawh, the trunk didn't burn up. Just the whole inside.
"`Roshell: Oh, just the inside of the car.
"`Smith: I threw the keys away in the... I/A ... and I wiped the car off with some gas, you understand what I'm saying? ... I/A ...
"`Roshell: Damn. So what you think, your brother going to L.A. with you?
"`Smith: My brother ain't got to go to L.A.
"`Roshell: Oh, he was with you, but he
"`Smith: He, my brother ain't got shot on here.
"`Roshell: Oh, alright.
"`Smith: He ain't got nothing, no, no... I/A ... (road noise)
"`Roshell: What I was saying we gonna have to get some money for both of y'all then.
"`Smith: No, naw, he, he, he's safe. It's me you understand ... I/A ... (airplane).'
"There was no evidence of a statement by defendant after defendant was arrested.
"Suffice it to say that the incriminating force of the whole evidence was overwhelming. The testimony of the witnesses summarized above as corroborated by the defendant's own recorded statements to Ms. Roshell, by other witnesses such as Michael Wilson who testified about defendant's confessory statement, Maurice Leonard concerning jewelry owned by the defendant as depicted in the bank photos and by the abundant physical evidence.
"The defendant's case at the guilt stage consisted of trying to impeach Angelica Willis with defendant's mother Clara Smith, who testified that she and her son had tried to evict Willis, that Willis had never expressed fear of defendant Smith, moreover, Mrs. Smith denied hearing her son talk about the killing on the phone."

I.
We remanded this cause for the trial court to hold a hearing in which the prosecutor would be ordered to come forward with reasons for his strikes of female potential jurors. Smith v. State, 698 So.2d 1166 (Ala.Crim.App.1997). The trial court was instructed to then examine these reasons and determine whether the prosecutor had used any of his strikes in a manner that discriminated against females. The record had indicated that the prosecutor had used 14 of his 15 strikes to remove females and that he did not strike a male potential juror until his fourteenth strike. The other factors the appellant argued indicated a discriminatory intent in striking these female potential jurors are contained in the original opinion. 698 So.2d 1166. On remand, the trial court held a hearing following which the trial court *426 found that the prosecutor came forward with sufficient nondiscriminatory reasons to justify his strikes. At the hearing, the prosecutor came forward with the following reasons for his strikes of the 14 potential female jurors:
1. Juror no. 81 was struck because her uncle had been prosecuted and she had expressed her belief that he had been innocent and, therefore, she would probably "lean toward" the defendant. She had also indicated that she wished to be struck because she did not want to serve as a juror in a case involving violence.
2. Juror no. 13 had indicated that she had strong feelings in opposition to the death penalty.
3. Juror no. 184 was struck because she did not believe in capital punishment and because she had previously sat on a jury which returned a not guilty verdict.
4. Juror no. 189 was struck because she did not wish to sit on the jury and had stated, in chambers, that she had "bad nerves" and had been taking antidepressant drugs. She had further stated in chambers that she would not look at the pictures that were to be introduced into evidence.
5. Juror no. 210 was struck because she was very young and had answered no questions posed either by the prosecutor or by defense counsel. The prosecutor indicated that "[t]here was just a lack of response or participation."
6. Juror no. 192 was struck because she had seemed disinterested and had not been paying attention to the questions. The prosecutor also acknowledged that he had drawn the court's and defense counsel's attention to her inattentiveness. The trial court affirmed that fact, referring to his notes.
7. Juror no. 216 was struck because she was a journalist for Southern Living magazine and the prosecutor stated that he had never allowed a journalist to remain on the jury in a case he was trying. The prosecutor stated that he believed that journalists might require the State to prove motive.
8. Juror no. 102 was struck because she had previously served on a jury that had returned a verdict of not guilty in a rape case.
9. Juror no. 94 was struck because she had stated that she tended not to believe police, because she had been raped by a police officer.
10. Juror no. 74 was struck because she was a law student and knew both the attorneys. She was also struck because she may have been a Sunday School teacher.
The four remaining strikes against female potential jurors were all based on the fact that they were religious or were connected to church membership, so that the prosecutor presumed that those potential jurors might tend to be more sympathetic to the defendant and to be more likely to reject the death penalty.[1] Specifically, juror no. 45 was struck because she worked at a church in the kindergarten class; juror no. 200 did volunteer work at the church and was the counselor of ministry; juror no. 150 was a church volunteer, a *427 Sunday School teacher, and a volunteer with the Red Cross (see note 1); and juror no. 155 was struck because she was a Sunday School leader. It was during the discussion of the prosecutor's reason for having struck juror no. 155 that the prosecutor explained this reason as follows:
"[T]his question of whether or not someone did volunteer work or worked in the Sunday School was asked by defense counsel under voir dire after the State had sat down and finished his voir dire. And, [juror no. 155] was one of the jurors that stated that she was a Sunday School leader. And this was a capital case, and there was a possibility that the Statethere was a good possibility that the State would be asking the jury to return an advisory verdict or opinion for death.
"The State also took into consideration from previous capital cases that it has tried, and usually, defense counsel, in their argument, would be asking the jurors to show mercy, and it was done in this case. I'm just trying to lay the predicate down why I struck a lot of these because they worked in the church; Sunday School teachers and Sunday School leaders, and things of that nature, and from people that I knew the defense counsel, if it came to the second phase of the sentencing hearing, would be asking the jurors to show mercy. And, it was my opinion that this argument would be receptive to someone who worked in the church and was well versed in the Bible more than someone who was not; be a female or male juror that was a strong worker in the church. No male jurors that was [sic] left seated on the jury worked in the church.
"As I stated before, as the Court will recall, this argument was made by [defense counsel] that one day they will be in front of their maker, and the judge would look back at that person's book-of-life, and he said you will not show you will not show Willie B. Smith any mercy, and now you are asking me to show you mercy. So, that is why I took into consideration when someone was a Sunday School leader, or Sunday School teacher, or someone that was well versed in the church, that that argument would be more receptive toward that juror as far as returning an advisory verdict of life without parole instead of death."
Thereafter, in explaining the striking of the other three jurors on the basis of their church affiliation, the prosecutor referred to this argument. On rebuttal, defense counsel sought to show that this reason given by the prosecutor for his striking of these four potential jurors was a pretext or a sham, by making the following argument before the Court:
"Next, I would like to address generally [the prosecutor's] explanation for striking people that they were involved in Sunday School and would be well versed in the Bible as a reason for striking. I believe he gave that reason for [juror no. 155, juror no. 200, juror no. 150, juror no. 45, and juror no. 74.][[2]]
"First of all, [juror no. 74] did not answer on voir dire that she had been a church youth leader that I found in the record. But, even if she had, involving the church group again, is not a valid, gender-neutral, or race-neutral reason for striking these women. Under Powell *428 v. State [548 So.2d 590 (Ala.Crim. App.1988) ], and many other Alabama cases, and other cases across the country, the striking of a person because of their membership or enroll[ment] in a particular group or particular profession, without more explanation than that, is not a valid reasona valid or race-neutral reason for striking them from the jury.
"He has talked about these people were well versed in the Bible and others were not. Well, first of all, that was not a subject of voir dire. They were not askednone of the jurors were asked what their knowledge of the Bible was, what their religious beliefs were, how their religious affiliation applied to how they would apply that to decide this case. There is no indication that any of these jurors that were struck, allegedly through their church involvement, would have been biased against the prosecution because of their involvement in church. The prosecution was not interested in finding out whether they had religious beliefs, other than whether they would or would not go for the death penalty. The question of whether they would vote for the death penalty was asked. None of these people responded in the affirmative that they would be unable to impose the death penalty. The State did strike two women because they expressed [opposition] to imposing the death penalty.
"None of these women expressed any resistance to the death penalty, and the State's reason given was that they were more likely to be sympathetic to the defendant is not plausible under the circumstances. It has no relationship in this particular case. There is no allegation that someone who is a church official was killed. There is no connection whatsoever with any kind of religious overtones in the facts of this case.
"Secondly, in regard to religion, I just addressed the fact that the prosecutor assumed bias without more sufficient reason. The second thing that ties into that group bias is that there was a lot of voir dire I think I have already addressed, butstate and many other occasions, and the cite for Powell is 548 So.2d 590 (Ala.Crim.App.1988). In addition, in Walker v. State, 611 So.2d 1133 (Ala.Crim.App.1992), and other cases in Alabama indicate that failure to engage in meaningful voir dire on a subject then claimed as a basis for striking of a juror, is stronglysuggests an inference of discrimination based on race or gender as it was in this case."
Defense counsel then referred to the striking of juror no. 74 based on her being a law student at the time of trial and noted that a seated juror, who was a male, also indicated that he was studying law at the time of trial and that his wife was a legal secretary. Defense counsel also stated that juror no. 74 had ended up serving as an alternate on the jury. Defense counsel further indicated that juror no. 174 had stated in the record that he had taken a course in criminal justice at the University of Alabama in Birmingham, but that he served on the jury. Defense counsel continued, stating:
"I want to return for a moment to the reason that was given which was church involvement for striking these jurors, and point out to the court that [another alternate juror], who wasthe defense strike no. 16, so she was not struck by the State, is an alternate on the jury, who was a woman juror, no. 188, who was a youth director at a Sunday School at the time of trial, and so answered on voir dire at page 304 of the record.
"The district attorney's statement that he struck everyone who had involvement in Sunday School or who was a Sunday *429 School teacher is simply false. He had used his strikes by the time this person was struck and failed to strike her, and there were other people struck by the State that did not have that characteristic of being involved in the church. [If] that was important for the State[,] [t]hey could have struck [juror no. 188], as well."
In response, the prosecutor stated that his notes reflected that juror no. 74not juror no. 188was a Sunday School youth director. The Court responded that juror no. 74 was the potential juror who knew the lawyers from law school. The prosecutor responded that he additionally had noted her to be a Sunday School director, but did not so note juror no. 188 to be a Sunday School director. The Court affirmed that its trial notes indicated that juror no. 188 had been noteworthy due to pretrial publicity issues and her employment in the sheriff's office. The prosecutor then stated, in pertinent part, as follows:
"I'm disputing that I did not strike [juror no. 188] if she was a Sunday School director or I would have struck her. My record reflects that I have [juror no. 74] as a Sunday School director, and I saw that in the record. I read the record, too, you know, and, as an officer of the Court, I know [juror no. 74], and she is a Sunday School youth director .... and [juror no. 188] is not, and that is a fact. I'm stating that as an officer of the Court. I'm saying the record is incorrect...."
Defense counsel responded, "Well, Your Honor, the record speaks for itself." Defense counsel then stated:
"To the extent [the prosecutor] is relying on the information he has either acquired or confirmed after the trial, [that] cannot be used to support his strikes. Additionally, Your Honor, I neglected to mention in the beginning to the extent that he relies at all on evidence thatnot evidence but after the jury was struck to support his reasons for striking people, those are not valid support for his reasons for striking, because they had not occurred. He is not clairvoyant; they had not yet occurred. The record speaks for itself. The record is presumed to be correct. It was certified by the court reporter, and it has been used on appeal, and it has been used in all other respects in Alabama at page 304 as being accurate and believed to be accurate by both the State and the defense up until this time, and that is all I want to say."
The prosecutor stated that he did look at the record and that he knew juror no. 74 because he had taught her at law school and that his records reflected that she was a Sunday school youth director. Upon questioning by the trial court, the prosecutor stated that he knew juror no. 74 before trial, but that he did not know juror no. 188 before trial, although he had seen her several times in the sheriff's office at the jail. A review of the record containing a transcript of the voir dire of the potential jurors establishes that, upon questioning by defense counsel, juror no. 188 answered that she was a Sunday school teacher and youth director and then responded that she was not paid for this position.
At the close of the prosecutor's statements concerning his reasons for these strikes, the prosecutor stated that, even if the record was correct concerning which potential juror was the youth director, the record would affirm that juror no. 74 had studied specifically criminal law or procedure in law school and that he believed that something to do with her studies in this area might influence her.
*430 Further, in closing his statement concerning his reasons for the strikes, the prosecutor made the following comments:
"I, possibly, could haveafter [defense counsel] brought out the questions that these people worked in Sunday schools or were church leadersmaybe I could have revisited voir dire to them to see what their feelings were toward the death penalty, being they were church members, or what their feelings were toward the death penalty, or how versed they were in Bible verses, but voir dire has to stop. It has to have some finality at some time. There is a possibility that [defense counsel] had other questions, so the State has an opportunity to voir dire."
Thus, it is apparent from the record that the statements made by the potential jurors indicating their religious affiliations or duties were brought out during defense counsel's questioning of the venire and that the prosecutor asked no follow-up questions. Moreover, each of these jurors who was struck by the prosecutor based on her religious undertaking had previously affirmed that she would have no problem imposing the death penalty.
In Walker v. State, 611 So.2d 1133 (Ala. Crim.App.1992), the case was remanded to the trial court for the prosecutor to come forward with race-neutral reasons for peremptory strikes of black veniremembers because the defendant had established a prima facie case of discrimination. On remand, the trial court found that the reasons given by the prosecutor were sufficiently race neutral; however, this Court reversed its judgment. Two of the strikes made by the prosecutor against black potential jurors were entered because one of the potential jurors was a minister's wife and another had commented that he was "very religious." Concerning these two strikes, this Court stated:
"These veniremembers did not respond when asked whether they had a fixed opinion against the death penalty or whether they not being absolutely opposed to it, `just [did not] like it,' or when asked whether any veniremember had `a personal, religious, or moral conviction against passing judgment on [his] fellow man.' `[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically' is evidence that the reason was a sham or pretext. [Ex parte] Branch, 526 So.2d [609] at 624 [(Ala. 1987).] ... Here, there is even stronger basis of concern, because in this case voir dire examination revealed that the two veniremembers in question did not possess the group trait assumed by the prosecutor. The prosecutor could have easily dispelled any doubt, had there been any, by asking a follow-up question specifically of each veniremember. He cannot, however, presume that, in the absence of a response to specific voir dire questioning as to whether the veniremember is in fact opposed to the death penalty, the veniremember would not vote in favor of the death penalty simply because the veniremember is very religious, is a minister or a minister's wife, or even is a member of a particular denomination.... The record offers nothing to give validity to the prosecutor's assumption about these two veniremembers. Compare Coral v. State, [628 So.2d 954] (Ala.Cr.App.1992) (in a capital case, the striking of a minister's wife was upheld where a white minister's wife was also struck); Hart v. State, 612 So.2d 520 (Ala.Cr.App.1992) (upholding the strike of a minister's wife, but acknowledging that this reason may be suspect); Yelder v. State, [630 So.2d 92] (Ala.Cr.App.1991) (in a non-capital *431 case, the striking of a minister was considered race-neutral where the veniremember was involved in prison ministry and where a white veniremember was struck because her husband was a retired minister); Fisher v. State, 587 So.2d [1027] at 1036-37 [(Ala.Cr.App.1991) ] (strike of a minister upheld where a victim's family had informed the prosecutor that it knew the veniremember, that he would not vote to convict the defendant in any event, and that it did not like him and where the prosecution had sought to challenge this veniremember for cause because of his feelings about capital punishment); Warner v. State, 594 So.2d 664, 666 (Ala. Cr.App. [1990]), rev'd, 594 So.2d 676 (Ala. 1991) (reason for strike of minister considered race-neutral in a capital case, where minister proclaimed that he did not believe in the death penalty and he knew one of the defendants); Bass v. State, 585 So.2d 225, 237 (Ala.Cr.App. 1991) (in a noncapital case, strike of `preacher' wearing a large cross was race-neutral where a minister was going to be a defense witness); Currin v. State, 535 So.2d 221 (Ala.Cr.App.), cert. denied, 535 So.2d 225 (Ala.1988) (in a noncapital case, the strike of a minister was upheld; no voir dire response was discussed)."
Walker v. State, 611 So.2d at 1141-42. (Emphasis omitted.) Thus, this Court determined that a prosecutor could not properly give as a reason for striking a potential juror the fact that the juror was very religious where there was no basis in the record for any assumptions to be drawn from this characteristic of the veniremember, nor was there any follow-up questioning by the prosecutor to lead him or her to such a conclusion.
In Giles v. State, 815 So.2d 585 (Ala. Crim.App.2000), the appellant alleged that the prosecutor's given reasons for his peremptory strikes in response to a Batson[3] objection were not race neutral. Specifically, the appellant referred to the following reason given by the prosecutor for his striking of a potential juror:
"`[Prosecutor 1]: The reason I gaveI don't know about these gentlemen, but the reason I have for [the strike] is I know her and I know her husband very well. They are very, very religious people, and in my opinion even though she did not answer when asked about having a problem, whether they would have a problem sitting in judgment, I didn't feel she could. I struck her in another case, too. But that was my reason.
"`[Prosecutor 2]: I think that is a sufficiently race-neutral reason. I had asked a question in one of the cases about people who may have problems because of religion. She did not respond, and yet [prosecutor 1] knows she is a highly religious person. And that is why she was struck.'"
In reversing the judgment in this case, this Court cited Walker v. State, supra, and stated:
"As was the case in Walker, the prosecutor in this case asked a specific question related to the veniremembers' religious beliefs, and [this potential juror] did not respond. Also, there was no follow-up questioning of [this potential juror] by the State. The prosecutor knew that [this potential juror] was `very, very religious,' and simply presumed that, as a result, she would not be able to sit in judgment of another person. This is precisely the type of action we found in Walker to be prohibited, and to constitute reversible error." *432 Giles v. State, supra at 587-88. A dissent to the majority opinion in Giles v. State, supra, acknowledged that a group trait that is not shown to apply to a specifically challenged juror is evidence of pretext and that a prosecutor cannot presume that a veniremember is opposed to the death penalty merely because he or she is very religious or is related to a minister or even is a member of a particular denomination; however, the dissent attempted to distinguish Giles based on the prosecutor's personal knowledge about the veniremember. The dissent argued that the reason for the prosecutor's strike in Giles was based on his personal knowledge rather than on a presumption, and that his statement indicated that he believed that the potential juror's failure to respond to the question in voir dire indicated that she was not being candid. Thus, the dissent stated that the prosecutor's reliance on his personal knowledge dispelled "the assumption that he made the strike based on the presumption that anyone involved in religious work or who maintained strong religious convictions would be biased." Giles, 815 So.2d at 590. The majority opinion addressed the dissent, arguing that the prosecutor's statements indicated that he personally knew the juror to be religious, yet assumed that she could not sit in judgment of another person despite her responses to voir dire questioning indicating otherwise. Moreover, the majority opinion noted that the prosecutor did not strike a veniremember who was a white minister.
In Lucy v. State, 785 So.2d 1174 (Ala. Crim.App.2000), a white defendant challenged the prosecutor's reasons for his peremptory challenges, arguing that they were insufficiently race neutral. The prosecutor, in Lucy v. State, supra, indicated that he struck a potential juror because "her `husband is a pastor' and because he `did not feel like she would be a strong law enforcement State's witness, that she would perhaps tend to be forgiving and forget.'" Id. at 1176. However, this Court noted that the record indicated that during the voir dire questioning, the veniremembers had been asked whether they could give the State and defendant a fair and impartial trial; this potential juror did not respond to the question. This potential juror also did not respond to a question whether any veniremember would have a problem returning a guilty verdict for any religious reason. Moreover, when individually questioned, this veniremember indicated that she "could follow the trial court's instructions and return a verdict based solely on the evidence presented." Lucy v. State, supra at 1176. Thus, this Court reversed the trial court's determination that the reasons given by the prosecutor were sufficiently race neutral, stating:
"Furthermore, unlike the prosecutor in Giles v. State, 815 So.2d 585 (Ala.Crim. App.2000), the prosecutor in this case did not state that his presumptions about [this potential juror] were based on his personal knowledge about [this potential juror]. Rather, it appears that the prosecutor presumed that, because her husband was a pastor, [this potential juror] would not be a strong law enforcement juror and might tend to forgive and forget. Based on the rationale set forth in Walker, we conclude that the prosecutor's reasons for striking [this potential juror] were not race-neutral and that the trial court's denial of the appellant's Batson motion was clearly erroneous. `[O]ne unconstitutional peremptory strike requires reversal and a new trial.' Ex parte Bird, 594 So.2d 676, 683 (Ala.1991)."
Lucy v. State, supra at 1178 (footnote omitted).
In the present case, the prosecutor asserted only that he had personal knowledge concerning one of the potential jurors *433 whom he struck for religious reasons. He further gave another reason for striking this jurorthat she knew both of the attorneys and that she had studied criminal law. The prosecutor claimed no personal knowledge of any of the other potential jurors he struck for religious reasons. The affirmations made by these potential jurors indicating that they maintained strong religious convictions or that they were engaged in religious work came out during defense counsel's questioning of the veniremembers; the prosecutor asked no follow-up questions to determine whether their work or beliefs might have any negative impact on their ability to serve as a juror in this case. Moreover, during earlier questioning by the trial court, none of these potential jurors responded that they would have any problem imposing a death sentence. The trial court specifically asked the venire, "Are there any of you people that because of, oh, religious scruples or moral, philosophical scruples, whatever, are unalterably opposed to capital punishment such that you can say to me now going into the proceedings, without having heard a word of testimony, without having been instructed by the court by the important law concerning death penalty litigation ... that you would not under any circumstances, irrespective of what might emerge in the course of the proceeding, irrespective of the law, you know that you would not vote for the death penalty?" Several jurors responded affirmatively to this question, but the potential jurors in question were not among them. These potential jurors also indicated that they could follow the law and evidence in arriving at their decision.
The law in Alabama concerning the standard and guidelines to be used for evaluating the reasons given by the prosecutor is unclear. Specifically, whether the courts in Alabama should follow the guidelines enunciated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), which established a more relaxed evaluation of reasons given for strikes or strictly adhere to the more stringent inquiry espoused under Alabama law, see Ex parte Bird, 594 So.2d 676 (Ala.1991), and Ex parte Branch, 526 So.2d 609 (Ala.1987), is in question. In Ex parte Bruner, 681 So.2d 173 (Ala.1996), the Alabama Supreme Court, in quashing the writ of certiorari, stated that "this Court disapproves the reliance of the Court of Civil Appeals on Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Those federal cases do not control Alabama's peremptory challenge procedure, which is based on adequate and independent state law." The author of a lengthy special concurrence to that decision stated that the following language by the United States Supreme Court in Hernandez v. New York, 500 U.S. 352, at 359-60, 111 S.Ct. 1859, 114 L.Ed.2d 395, was held inappropriate as a retreat from the standard declared in Batson v. Kentucky, supra:
"`In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law....
"`A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.'"
Ex parte Bruner, 681 So.2d at 180 (Cook, J., concurring specially) (emphasis in original). The concurring opinion continued, *434 stating that the "difference between the Alabama and federal standards was even more clearly evidenced in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)," id., by criticizing the United States Supreme Court's language in reference to the second step of peremptory challenge, specifically, the burden of rebutting a prima facie case of discrimination, where the United States Supreme Court stated that the evaluation "`does not demand an explanation that is persuasive, or even plausible.' 514 U.S. at 768, 115 S.Ct. at 1771 (emphasis in original)." Ex parte Bruner, 681 So.2d at 181. The special concurrence in Ex parte Bruner expressed further disapproval of the Purkett decision:
"The Court cited with peculiar disapproval Batson's footnote 20 containing the terms `clear' and `specific' stating: `The Court of Appeals appears to have seized on our admonition in Batson that to rebut a prima facie case, the proponent of a strike "must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges ...."` 514 U.S. at 768, 115 S.Ct. at 1771 (emphasis added). The Court concluded that `[t]he prosecutor's proffered explanation in [that] case that he struck [the veniremember] because he had long, unkempt hair, a mustache, and a beard[was] race-neutral and satisfie[d] the prosecution's step 2 burden of articulating a nondiscriminatory reason for the strike.' Id."

Id. at 181. The special concurrence distinguished Alabama's procedure of analyzing the reasons, stating that in Alabama these reasons "even if facially neutralare not viewed by the judiciary with credulous naivete. In Alabama, `[t]he trial court cannot merely accept the specific reasons given by the prosecutor at face value.... Rather, the court must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination.'" Id. at 179.
Following Ex parte Bruner, supra, the Alabama Supreme Court denied the petition for certiorari review in Fletcher v. State, 703 So.2d 432 (Ala.Crim.App.1997), wherein the Alabama Court of Criminal Appeals again affirmed the United States Supreme Court's evaluation of a prosecutor's explanations for strikes stated in Purkett v. Elem, supra, and Hernandez v. New York, supra. This Court stated:
"`"[The] United States Supreme Court recently stated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at 768, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations, *435 and it is also at this stage that `implausible or fantastic justifications may (and probably will) be found to be pretext for purposeful discrimination.' Purkett, 514 U.S. at 768, 115 S.Ct. at 1771."
"`Bush v. State, 695 So.2d 70, 96 (Ala. Cr.App.1995).'"
Fletcher v. State, supra, at 435-36.
Thereafter, the Alabama Supreme Court again addressed what is required in Alabama by the proponent of a strike in order to prove the strike to be nondiscriminatory:
"`The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory.' [Ex parte Branch, 526 So.2d 609, 623 (Ala.1987)] (emphasis in original).
"`In evaluating the evidence and explanations presented, the trial judge must determine whether the explanations are sufficient to overcome the presumption of bias.... The trial judge cannot merely accept the specific reasons given by the prosecutor at face value ...; the judge must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination.'

"Id. at 624 (citations omitted).* After race-neutral reasons are articulated, the moving party can offer evidence showing that the reasons or explanations given constitute merely a sham or pretext. Id. at 624.
*"We note that the United States Supreme Court originally interpreted the 14th Amendment to the United States Constitution to require a similar standard of scrutiny of reasons offered for an allegedly discriminatory peremptory strike. The Batson decision stated that the proponent of a strike must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the strike and demanded that the reasons be `related to the particular case to be tried.' 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20. However, we recognize that the subsequent decisions of the United States Supreme Court in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), can be interpreted to ease the federal standard. See Bruner v. Cawthon, 681 So.2d 161, 170-72 (Ala.Civ. App.1995). However, Hernandez and Purkett do not govern Alabama's peremptory challenge procedure, which rests upon adequate and independent state law. Ex parte Bruner, 681 So.2d 173 (Ala.1996). Thus, regarding the scrutiny that a trial court is to apply to reasons offered by a proponent of a peremptory strike, we adhere to the Alabama standard declared in Ex parte Branch, supra."
Looney v. Davis, 721 So.2d 152, 164 (Ala. 1998).
Thereafter, in Hagood v. State, 777 So.2d 162 (Ala.Crim.App.1998), aff'd as to conviction, rev'd and remanded with instructions as to sentence, Ex parte Hagood, 777 So.2d 214 (Ala.1999), the standard in Purkett and Hernandez were again used in analyzing the prosecutor's reasons.
Finally, in Ex parte Drinkard, 777 So.2d 295 (Ala.2000), the Alabama Supreme Court addressed a reason given by the prosecution for striking a potential juror, specifically his involvement with law enforcement and his employment as a talk show host, which they held was unsubstantiated by the record. Despite acknowledging the standards for evaluating such reasons set forth in Ex parte Bird, 594 So.2d at 683, that "the failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination," and that of Ex parte Branch, 526 So.2d at 624, that the "trial judge cannot merely accept the specific reasons given by the prosecutor at face value," and acknowledging that "a simple *436 question directed to the veniremember could have dispelled any doubt," Ex parte Bird, 594 So.2d at 683, the Alabama Supreme Court nonetheless found that the trial court's decision was not "clearly erroneous." See Ex parte Drinkard, supra, at 306.
In the present case, the prosecutor came forward with a facially neutral explanation for striking these potential jurors; his reasons based on religion were facially neutral to a claim of discrimination based on gender.[4] In light of the Alabama Supreme Court decision in Ex parte Drinkard, we cannot hold that the trial court's determination that the reasons were gender-neutral was "clearly erroneous." Although the appellant came forward with arguments indicating that the reason given by the prosecutor was pretextual, the trial judge stated in his order that he had presided for many years over many trials prosecuted by the particular attorney who was prosecuting for the State. The trial judge acknowledged that the prosecutor is "certainly not a person prone to strike minorities denounced in the Batson case and its progeny." The trial judge further stated in his order that "[i]n this writer's judgment, formed on the basis of extensive in-court experience with [the prosecutor] and close acquaintanceship with others that know him, there is no person more equitable and just in the performance of his duty as deputy prosecutor than [the prosecutor]." See Bui v. State, 627 So.2d 855, 861 (Ala.1992).
"`A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987); Ex parte Thomas, 659 So.2d 3 (Ala.1994); Lynn v. State, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989).'

"Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996).
"`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed."'

"Davis v. State, 555 So.2d 309, 312 (Ala. Crim.App.1989), quoting Powell v. State, 548 So.2d 590 (Ala.Cr.App.1988)."
Fletcher v. State, 703 So.2d 432, 436 (Ala. Crim.App.1997).
All of the reasons given by the prosecutor for his strikes of these potential jurors were sufficiently facially gender neutral.

II.
The appellant argues that the failure of a member of the jury to reveal that he had prior knowledge of the case violated the appellant's rights to due process, a fair trial, and a reliable sentencing determination. The record indicates that none of the jury members had indicated during voir dire that they had any prior knowledge of the present offense. In his brief on appeal, the appellant asserts that, because he believed that pretrial publicity and prior knowledge were very important to this case, he used 7 of his 15 peremptory challenges to exclude veniremembers who had been exposed to information about the case. However, after the appellant was convicted and the jury returned its advisory verdict of death, but before the sentencing hearing in front of the trial court, the trial court received a letter written by one *437 of the jurors who had served on this case. Within the lengthy letter, the juror stated as follows:
"One juror who lived in Centerpoint, and was a vocal proponent of sentencing the defendant to death, even made a comparison of the jury selection process by mentioning the fact that he had previous knowledge of the case (which he supposedly told you about) and thus disclosed it to you. Therefore, those who were sympathetic to life should have disclosed their problem with the death penalty."
Taken in context, the juror was arguing that he felt that the other jurors had perhaps been pressed into recommending death. Earlier in the letter, the juror also wrote that "[d]uring the verdict deliberations I had no reasonable doubt and I still have no reasonable doubt that the defendant was guilty. It is the sentencing phase of the trial that concerns me." Within the body of the letter, the juror reevaluated the jury's recommendation and noted that, perhaps it was unfair to return the death recommendation, especially in light of the fact that the juror had been privy to a far more comfortable life than that of the defendant.
During the sentencing hearing before the trial court, defense counsel included the juror's letter in his argument to the judge. He stated, "the jury has found him guilty, I am not here to argue about what the jury did. You have [the juror's] letter in regard their misunderstanding and their feeling about sentencing him to the electric chair." However, defense counsel gave the letter very little emphasis in the body of his argument for mercy. After considering the arguments of counsel, and other pertinent evidence, the trial court returned a sentence of death. Thereafter, during the hearing on the appellant's motion for a mistrial, the following transpired:
"[Defense counsel]: ... You haveI believe you have already entered into the record a letter that you got from one of the jurors.
"The Court: That's right.
"[Defense counsel]: I believe [the juror]. Without arguing the letter, I would just want to confirmin fact, I'll ask Your Honor to consider the fact that he said that
"[Prosecutor]: I'm going to object at this time for purposes of the motion for the new trial to anythingany affidavit or any testimony
"The Court: It wasn't an affidavit, just a letter.
"[Prosecutor]: Any letter or any testimony relating to what jurors' deliberations were in effect to negate a verdict. The jury deliberations are secret and the only way that a jury's deliberations can be brought out in open court, [is] if the defense counsel has some evidence that there was some extraneous outside forces operating to effect that
"The Court: I've read the letter. You have read it. [Defense counsel] has read it.
"[Defense counsel]: Yes, sir.
"The Court: And it's in the record.
"[Defense counsel]: That's all I would have to say.
"The Court: Anything else?
"[Defense counsel]: If you will consider that letter and consider my entire motion for a new trial, Your Honor, and grant us a new trial.
"The Court: I'll rule in writing."
Thereafter, the trial court denied the motion for a new trial.
There is no indication that the juror imparted any outside knowledge to the *438 jury concerning this case or that he prejudiced the appellant in any way by using outside information he had learned before trial. Although the appellant argues that the fact that a juror was, according to another juror's letter, not forthcoming or honest in his answers during voir dire, there is no real evidence of that fact in the record. As previously stated, the letter was not an affidavit; the author of the letter did not testify concerning this possible hearsay statement, nor did the juror from Centerpoint testify.
"After a case has been submitted to the jury, their deliberations in the jury room are not subject to review. Gamble, McElroy's Alabama Evidence, 3rd Ed., § 94.06, p. 207. Public policy forbids that a juror disclose deliberations in the jury room and demands that they be kept secret. Taylor v. State, 18 Ala. App. 466, 93 So. 78 (1922); Harris v. State, 241 Ala. 240, 2 So.2d 431 (1941). Permitting such impeachment would open the door for tampering with the jury after the return of their verdict. Hawkins v. United States, 244 F.2d 854, 856 (C.A.Va.1957).
"Consequently a jury's verdict is not subject to impeachment by the testimony of jurors as to matters which transpired during the deliberations. Fox v. State, Ala.Cr.App., 269 So.2d 917 (1972). A juror may not, either in impeachment or in support of his verdict, testify as to his mental operation in reaching the verdict.
"`But in order to sustain a verdict of the jury, for the affidavits of the jurors to be admissible they must be with respect to facts and occurrences open to the observation of other jurors so that they may be subject to contradiction, for the rule does not permit evidence by the jurors "of their own mental operations by disclosing the grounds of, or the reasons for, their verdict, the discussions which took place in the jury room, or the motives or influences which affected their deliberations and decision by denying that they were affected by matters which might, if their effect was prejudicial to the moving party, furnish grounds for a new trial, or by asserting that they disregarded improper instructions by the court or incompetent material evidence which was before them and was not seasonably withdrawn or excluded."` Birmingham Electric Co. v. Yoast, 256 Ala. 673, 678, 57 So.2d 103, 107 (1951)."
Atwell v. State, 354 So.2d 30, 37-38 (Ala. Crim.App.1977), cert. denied, 354 So.2d 39 (Ala.1978). See also Berard v. State, 486 So.2d 458 (Ala.Crim.App.1984) (wherein this Court held that a juror may not testify concerning the way that certain testimony was considered in the jury room or that certain evidence was or was not influential in order to impeach the verdict). See Vinzant v. State, 462 So.2d 1037 (Ala.Crim. App.1984) (a jury's verdict may not be impeached by the testimony or affidavits of jurors as to what transpired among them during deliberations).
"`A juror may not testify, either in impeachment or in support of his verdict, as to what effect a matter had upon his mind as causing or not causing him to agree to the verdict, as to why he agreed to the verdict or concerning the mental processes by which he came to agree to the verdict.' C. Gamble, McElroy's Alabama Evidence, § 94.06(2) (3rd ed.1977). `[T]he rule does not permit evidence by the jurors of their own mental operations.' Birmingham Electric Company v. Yoast, 256 Ala. 673, 678, 57 So.2d 103 (1951)." *439 Walker v. State, 519 So.2d 598, 599 (Ala. Crim.App.1987). See also Neal v. State, 731 So.2d 609, 618-19 (Ala.Crim.App.1997) (wherein the appellant filed a motion for new trial submitting a newspaper article indicating that a juror had spoken of his knowledge of the "history of the trial," and therefore he alleges considered extraneous facts, in an attempt to impeach the verdict.)
In the present case, the appellant has failed to show prejudice because of the alleged juror misconduct. See Brown v. State, 545 So.2d 106 (Ala.Crim.App. 1999) (wherein this Court concluded that the Alabama Supreme Court's decision in Dawson v. State, 710 So.2d 472 (Ala. 1997), indicated that the standard to be applied in this situation was "whether prejudice was shown, see Reed v. State, 547 So.2d 596 (Ala.1989), on remand, 547 So.2d 599 (Ala. Cr.App.1989)").
"[T]he problem of jurors failing to disclose material information during voir dire is neither a recent development nor an unusual occurrence. In 1965 Dale Broeder published his seminal study on juror dishonesty during voir dire. The article included many case studies detailing why jurors fail to respond honestly during voir dire. For some jurors, the questions seemed too trivial to merit an honest response. Other jurors were simply too nervous to volunteer information during voir dire. For still others, the desire to serve outweighed the desire to tell the truth. One particular juror viewed selection as an honor and intended to use his jury experiences as a subject of barroom conversation. More recent research indicates that approximately twenty-five percent of jurors fail to reveal material information during voir dire.
"Given the high frequency with which jurors fail to disclose material information, it should come as no surprise that a showing of juror dishonesty, made after the trial, does not necessarily lead to the granting of a new trial. As Professor David Crump has noted, courts must balance two strong and competing interests: fairness and finality. In the criminal context, fairness means the right to impartial jurors, the right to the intelligent use of peremptory strikes, and the right to be free from juror misconduct. Courts will consider some combination of these rights in deciding whether to grant a new trial."
When Jurors Lie: Differing Standards for New Trials, 22 Am.J.Crim.L. 733, 734-35 (1995) (footnotes omitted).
In the present case, the appellant was not deprived of a fair trial because a juror might have had knowledge of the case despite his failure to reveal this knowledge.

III.
The appellant alleges that the State's withholding of an extrajudicial statement that he gave to the police informant, Latonya Roshell, violated his rights to due process, a fair trial, and a reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as under Alabama law. Specifically, the appellant alleges that the statement was withheld in violation of both state and federal law that mandates the disclosure of a defendant's extrajudicial statements, and that he was unduly prejudiced by its admission because he was unable to prepare for his defense and because he was unable to consider the ramifications of the statement in deciding whether to accept a plea offer from the State. The record indicates that just before the voir dire examination of the jury venire, the prosecutor informed defense counsel of a statement made by the appellant during a telephone call to *440 Latonya Roshell from jail. The prosecutor stated that he had learned of this conversation on the Friday afternoon preceding the Monday procedures and stated that he attempted to call defense counsel at that time. Defense counsel confirmed the prosecutor's attempts to contact him, but made a motion to suppress the statement. During the hearing on this motion to suppress, defense counsel acknowledged that the prosecutor had not deliberately withheld the statement by arguing that "granted [prosecutor] I don't think he knew about it or he said he didn't and I certainly believe him," but defense counsel argued that to allow the evidence would amount to a "trial by ambush" because, he said, Latonya Roshell had made no mention of this conversation during the preliminary hearing and they had had no opportunity to cross-examine her concerning this alleged telephone conversation. The prosecutor acknowledged that the conversation was made on Thanksgiving Day when the appellant telephoned Roshell and stated that he was attempting to discover who had "told on him" and stated, "`Well, I know it was either you, Michael or Jermaine. And I didn't think you would tell on me. You know I did it, and I know I did it, but I ain't telling the Court I did it.'" (As paraphrased by the prosecutor.) The Court clarified defense counsel's motion and stated that defense counsel was seeking an opportunity to speak to Roshell before her testimony and defense counsel responded that he would certainly want to do that but that the late timing of the discovery of the evidence gave the State an unfair advantage. Defense counsel then argued that Roshell was recruited by the police, wired by the police, and was acting as a police agent. The prosecutor responded that she had previously worked for the police, but not for the Birmingham police. The prosecutor stated that Roshell did not seek the police with the intent of working for them or receiving money as a confidential informant. He stated that she was not paid for the information and that the conversation was initiated by the appellant upon his telephone call to her. The prosecutor further acknowledged that she was not wired at the time of the conversation and that she did not have any communication with the police concerning this incident, so that the conversation was just discovered immediately before trial. The trial court then denied the appellant's motion.
In the present case, as defense counsel conceded, the prosecutor had no knowledge of the existence of this statement by the appellant before he informed defense counsel of its existence. Generally, the prosecution cannot be held to have failed to comply with a discovery request when "the requested information was not in the prosecution's possession. See, H. Maddox, Alabama Rules of Criminal Procedure, § 16.1 at 489 (1990)." Averett v. State, 640 So.2d 1, 2 (Ala.Crim.App.1993). However, even though a prosecutor is unaware of the existence of certain information, if law-enforcement agents in the prosecutor's district have possession of this information, the prosecutor may be held to have knowledge of the information or evidence imputed to him. See Ex parte Hunter, 777 So.2d 60, 61 (Ala.2000) (wherein the Alabama Supreme Court held that certain testimony by an investigating officer concerning an undisclosed statement made by the defendant required a mistrial for failure to disclose). In Ex parte Hunter, supra, the Alabama Supreme Court stated that, although the prosecutor informed the trial court that he had no knowledge that the officer would make such a statement, "Alabama law imputes to a prosecutor knowledge of information supplied by any investigating officer's testimony." Id., at 61. The Court *441 cited McMillian v. State, 616 So.2d 933 (Ala.Crim.App.1993), wherein this Court held that a prosecutor could not be held to have suppressed a statement because it was in the possession of officers of a different jurisdiction, so that the prosecutor failed to have any knowledge of the statement. See Robinson v. State, 577 So.2d 928, 931 (Ala.Crim.App.1990) (Bowen, Judge, concurring in result only, stating that the patrolman's knowledge "must be imputed to the district attorney as was done in Patton v. State, 530 So.2d 886, 889 (Ala.Cr.App.1988)."). But see Robinson v. State, supra (holding that the prosecution could not have produced an incriminating statement made by the appellant to an investigating officer, because he was not aware of the statement). Stewart v. State, 601 So.2d 491, 499 (Ala.Crim.App.1992) (in a capital-murder case, where the prosecutor telephoned the officer on the scene of the offense who had testified at trial that day and learned that the appellant had made another incriminating remark to the officer at the scene, there was no discovery violation because the prosecutor made defense counsel aware of the statement as soon as he became aware of it himself). Brown v. State, 545 So.2d 106, 114-15 (Ala. Crim.App.1988) (wherein this Court found no error in a prosecutor notifying defense counsel of a change in testimony concerning the appellant's statement to an investigating officer where the prosecutor informed defense counsel the morning after he learned of the changes in the officer's testimony). See also R.D. v. State, 706 So.2d 770, 784-85 (Ala.Crim.App.1997) (wherein the appellant's argument that the State had constructive possession of the undisclosed tapes because the special prosecutor had represented the ex-wife in a civil case and, the appellant alleged, must have known of the existence of the tape, was without merit).
In the present case, the prosecutor would not be held accountable for the knowledge of the information of the telephone conversation made by the appellant to Roshell, however, because Roshell was not an agent of the State and the statement was initiated by the appellant.
The evidence indicates that the telephone call by the appellant was unsolicited by Roshell and thus spontaneous. See Robinson v. State, supra, at 930 (because a statement was voluntary and initiated by the defendant in a setting that did not involve interrogation, it was properly admitted, even though it was made to a police officer). In Cure v. State, 600 So.2d 415 (Ala.Crim.App.1992), cert. denied, 600 So.2d 421 (Ala.1992), an officer listened in on a telephone conversation between the defendant, who was an inmate at the time, and a third party, who had requested the officer to monitor the conversation. This Court held that the defendant-inmate was not in custody within the meaning of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), stating:
"`In recognizing "that a prison inmate is not automatically always in `custody' within the meaning of Miranda," United States v. Conley, 779 F.2d 970, 973 (4th Cir.1985), cert. denied, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986), we hold that "custody" or "restriction" in the context of prison "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement," id. (quoting Cervantes v. Walker, 589 F.2d [424, 428 (9th Cir.1978))]. "Thus, whether an inmate is `in custody' under Miranda depends on the circumstances of the case." United States v. Cooper, 800 F.2d 412, 414 (4th Cir.1986).' Arthur v. State, 575 So.2d 1165, 1188 (Ala.Crim. App.1990), cert. denied, 575 So.2d 1191 (Ala.1991)."
*442 Cure v. State, 600 So.2d at 419. Thus, this Court determined that this statement was properly admissible due to the noncustodial circumstances in which it was made, "[w]ithout deciding whether the [defendant's] friend was an agent acting on behalf of law enforcement officers or was a private citizen." Id.
Moreover, Roshell was not acting as an agent of the police, as it is clear that she was not instructed to engage in this conversation in order to elicit incriminating statements from the appellant. In Gilchrist v. State, 585 So.2d 165, 174-78, this Court looked to the United States Supreme Court's decision in Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (wherein an imprisoned accused's wife was allowed to meet with him in the presence of an officer who tape-recorded their conversation), in determining that a third-party girlfriend who met with the defendant in jail was not acting as an agent of the police because she was not instructed by the police to question the defendant or get information from him; nor was her meeting a "psychological ploy" that would equate to an interrogation; nor was the defendant coerced by her due to moral and psychological pressures inherent in their relationship. In the present case, Roshell was also not an agent for the above-stated three reasons. Gilchrist v. State, 585 So.2d at 175, citing State v. Bruneau, 131 N.H. 104, 552 A.2d 585, 588 (1988) (Souter, J.) (holding that a finding that a third party was acting as an agent of the police "require[s] proof of some affirmative action by a police officer or other governmental official that preceded the interrogation and can reasonably be seen to have induced the third party to conduct the interrogation that took place"). See also United States v. Taylor, 800 F.2d 1012, 1016 (10th Cir.1986), cert. denied, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987) ("No agreement was made between [the informant] and the Government and no benefits accrued to [the informant] for his cooperation."). Similarly, the evidence established that Roshell did not receive any compensation for her information concerning the appellant's telephone conversation.
Therefore, because the appellant's telephone conversation with Roshell was not admitted in violation of the trial court's discovery order or in violation of constitutional or state law, there was no error on this ground.

IV.
The appellant argues that his rights to due process, a fair trial, and a reliable sentencing determination were violated by the trial court's reference to inadmissible evidence to which his jury had also already been exposed. The record indicates that the State introduced into evidence an audiotaped conversation between the appellant and Latonya Roshell. There were apparently several reels of this tape. The jurors each received a transcript of the conversation contained on the tape. Approximately 16 minutes into the tape, the trial court had the tape stopped and requested to speak to the attorneys outside the presence of the jury. The trial court then spoke to defense counsel, acknowledging that although defense counsel's trial tactics were a matter for his own consideration, the trial court pointed out that certain parts of the conversation alluded to collateral bad acts by the appellant; specifically, the fact that he had sold drugs, the fact that he had apparently previously been arrested, and some conversation indicating that the appellant could be given money and run away. Defense counsel stated that he planned to object to the statements concerning the selling of drugs and prior arrests when that portion of the tape approached; that portion of the conversation *443 was apparently on the next reel, and defense counsel stated that he planned to object when the reels were being changed. The trial court then began to direct that the statements be removed from the transcripts by having them covered with blank paper. Defense counsel acquiesced in this plan, and thanked the judge. The prosecutor was to stop and start the tape appropriately, so that the objectionable portions would be omitted from the jury's hearing, and defense counsel would stand with the prosecutor during this process. There was no objection by defense counsel as to this arrangement. Defense counsel also asked that the conversation concerning the possibility of money being given to the appellant so that he could escape remain in the transcript and tape, arguing that this conversation indicated that the State's witnesses would commit a robbery to help the appellant. Defense counsel acknowledged that this would be his argument to the jury. Thereafter, when the jury was again present and the tape was played for them, the trial court informed them, during the playing of the tape, there would be times during which the prosecutor would retire with the tape recorder and fast forward it past certain material. The trial court explained, "sometimes there are materials that don't really pertain to the litigation, of necessity, that gets involved in a printed document, so we have take a few minutes just to make sure everything that comes to your attention is pertinent."
The appellant argues that the trial court's reference to pertinent parts of the transcript being omitted, improperly referenced and drew the jury's attention to the redacted portion of the transcript concerning the collateral bad acts. Because the appellant did not object to these instructions by the trial court, the plain-error rule applies to this claim. Rule 45A Ala. R.App. P.
In Taylor v. State, 808 So.2d 1148 (Ala. Crim.App.2000), the appellant had argued that the trial court had improperly allowed the jury to hear a portion of his audiotaped statement that referred to uncharged misconduct and that had been redacted at the defense's request, because he argued that the gap, as well as the trial court's instructions concerning the gap, prompted the jury to draw adverse inferences. Using the plain-error standard, this Court determined that, in light of the trial court's statement to the jury that the skipped portions were irrelevant and should be disregarded,
"there is no likelihood that, given the court's instructions, the jury could have reached an adverse conclusion or guessed what the missing portion contained based on the gap in the tape. `Because the trial court's statements, when viewed under the facts of this case, were not such as to influence the result of the case, they did not constitute plain error.'"
Taylor v. State, 808 So.2d at 1181, quoting Maples v. State, 758 So.2d 1 (Ala.Crim. App.1999).
Similarly, in the present case, the omitted portions would not have suggested to the jury the prior bad acts of the appellant, based on a review of the entire conversation. Moreover, the trial court's instructions to the jury properly informed them that the omitted portions were not pertinent and dealt with matters unrelated to the present case. There was no plain-error pursuant to this ground.

V.
The appellant argues that the trial court improperly considered the appellant's court-ordered pretrial psychiatric examination in sentencing him to death. The appellant *444 raises three claims of error as to this ground: that the psychiatrist's findings were considered by the trial court although the psychiatrist never testified at trial, so that he was never available for cross-examination; that the appellant was never Mirandized before the court-ordered evaluations; and that the trial court improperly considered the findings as to his competence to stand trial, a matter that he argues has no pertinence to sentencing. During the trial and sentencing, the appellant failed to object to this matter; therefore, this claim must be analyzed pursuant to Rule 45A, Ala. R.App. P.
Although the appellant argues that he was never confronted with the evidence by the psychiatrist and that this evidence was never admitted at trial, the record indicates the trial court had orally communicated the findings to defense counsel prior to trial, and that the written findings from the psychiatrist were also given to defense counsel prior to trial. Thus, the appellant had an opportunity to review the findings before trial and to call the psychiatrist as a witness, or otherwise to rebut his findings. Furthermore, defense counsel had the appellant evaluated by his own expert, who was called to testify for the appellant at sentencing. Thus, the appellant was not prejudiced on this ground, and there was no plain error. Cf. Jackson v. State, 791 So.2d 979 (Ala.Crim. App.2000) (wherein this Court held that, although the trial court improperly considered extrajudicial factors from the trial of the codefendants during the sentencing phase of the appellant's capital trial, the error was harmless as the trial court's sentencing order was not so egregious to require a new sentencing order based on the evidence contained in the record, quoting Sockwell v. State, 675 So.2d 4 (Ala. Crim.App.1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996); Fortenberry v. State, 545 So.2d 129, 144 (Ala.Crim.App. 1988), aff'd, 545 So.2d 145 (Ala.1989)).
The appellant's argument that the findings were improperly considered because he was not Mirandized before the psychiatric evaluation was conducted is also without merit. The record indicates that the psychiatric evaluation to which the appellant refers, that conducted by Dr. Rosencrans, was never in evidence because he never testified before the jury nor were any of his findings ever presented to the jury. However, a defense-paid psychologist, Dr. Blotcky, did testify on the appellant's behalf during the sentencing hearing before the jury. In his sentencing order, other than a portion where the trial court recites that the psychiatrist did make a psychiatric evaluation and find the appellant competent, the trial court referenced Dr. Rosencrans's findings in considering the mitigating factor whether the appellant was under extreme mental or psychological distress and in considering whether nonstatutory mitigating circumstances existed. The order finds that the statutory mitigating circumstance concerning extreme emotional or psychological distress did not exist and refers to the reports of both Dr. Rosencrans and Dr. Blotcky as support for this conclusion. The trial court also found the existence of several nonstatutory mitigating circumstances based on Dr. Rosencrans's report, including factual biographical information imparted by the appellant. Thus, the factual information derived from the appellant and contained in the psychiatrist's report benefited the appellant by constituting nonstatutory mitigating circumstances to be considered in sentencing the appellant. The trial court's statement concerning his findings as to the nonexistence of the statutory mitigating circumstance that the appellant *445 was under the influence of extreme emotional disturbance was as follows:
"No evidence adduced at trial, nor at the second stage in front of the jury, nor by way of evidence adduced at third stage, nor the reports of either psychologist, Dr. Rosencrans or Dr. Blotcky, suggest that the defendant acted under the influence of a mental or emotional disturbance, much less extreme mental or emotional disturbance."
Despite the appellant's reliance on Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), there was no error on this ground because this situation is distinguishable from that in Estelle. Ex parte Hart, 612 So.2d 536, 540-41 (Ala. 1992). As in Ex parte Hart, it is important that the psychological report was never seen by the jury and yet the jury recommended a sentence of death. Id. at 540. Additionally, the appellant has failed to show that the information in the psychologist's report was "materially false," id. at 541, in that the psychologist retained by the defense also came to the conclusion that the appellant was not under the influence of extreme mental or emotional distress.
Furthermore, although the appellant argues that the trial court improperly considered the psychiatrist's finding concerning his competence to stand trial, a review of the record clearly indicates that the information concerning this finding was simply a statement that the psychiatrist found appellant competent to stand trial which was included in the statement of facts portion of the sentencing order. There is no indication that this fact was considered by the trial court in sentencing, rather a review of the record indicates otherwise. Thus, there was no plain error on this ground.

VI.
The appellant argues that the testimony of the victim's brother at the sentencing hearing, in which he encouraged the trial court to sentence the appellant to death, violated Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The record indicates that during the sentencing phase of this capital trial before the trial court, the State announced its intention to present to the Court the testimony of the victim's brother as to how the victim's death "has affected the family in general." Defense counsel objected, stating:
"I know there is [sic] cases that would indicate that they could do it, but [I] don't feel like that is appropriate at this time. And we can understand and appreciate the fact it has been a terrible thing for the family, for any family."
The trial court responded that the witness would be allowed to testify. During his testimony, the following transpired:
"[The victim's brother]: Just like on the night that my sister was killed, she begged for mercy and didn't get any mercy. Today, I am begging you to sentence Willie B. Smith to the fullest extent of law, which is electrocution by death.
"[Defense counsel]: Your Honor, I object to that, I think that's inappropriate, how it affects his family, giving his opinion what the sentence should be. We understandI think that's inappropriate and ask you to not consider.
"[The Court]: All right, sir. Go ahead and make your statement, please, sir, if you have anything else to say.
"[The witness]: That's basically all I have left to say.
"[The Court]: Thank you very much."
*446 Thereafter, defense counsel cross-examined the witness as to how he believed, as a Christian, that electrocuting the appellant would be merciful or would remove the offense from the family's minds.
In the sentencing order filed by the trial court, the initial section sets out the statement of the case, makes a brief factual recitation of the three stages of this murder trial, and states, concerning the third stagethe sentencing stage before the trial courtas follows:
"Third stage sentencing was conducted July 17, 1992, the pre-sentence report and [a juror]'s letter wherein [juror] states his misgivings in having voted for death were made a part of the record.
"Brother to the deceased testified for State; sister and mother of the defendant testified as did Ms. Lucia Penland, Executive Director of the Alabama Prison Project. Defendant did not testify or choose to speak before pronouncement of sentence."
Thereafter, after the lengthy sentencing order, the trial court thoroughly explained his considerations in arriving at a sentence of death.
The trial court could have properly considered the impact of the crime on the victim's family members; however, it would have been improper for him to consider the portion of the victim-impact evidence concerning the recommendation of an appropriate punishment. Despite such testimony in the present case, there was no reversible error because the trial court acknowledged that any consideration by it of this objectionable testimony would have been inappropriate, as evidenced by the trial court's sustaining of defense counsel's objection by stating, "All right," in response to that objection. There was no inclusion in the sentencing order of any consideration of this testimony; all that was included was a mere factual assertion that the victim's brother testified during the third phase of the trial.
In Taylor v. State, 808 So.2d 1148 (Ala. Crim.App.2000), Taylor argued that the trial court had improperly considered sentencing recommendations made by family members and friends of the victims offered during sentencing and as part of the pre-sentencing report. Specifically, Taylor argued that the trial court should not have considered the victim-impact testimony of two family members given during the sentencing phase before the trial court, wherein they both asked the trial judge to impose the death penalty. A packet of letters from other family members was also introduced into evidence by the prosecutor, most of which recommended that the judge impose the death penalty. This Court found no plain error by the trial court as to this matter, and stated:
"Statements regarding the impact of the crime on the victim's family members are properly before a trial court at sentencing. Payne v. Tennessee, 501 U.S. 808[, 111 S.Ct. 2597, 115 L.Ed.2d 720] (1991). Therefore, the trial judge properly considered the victim-impact evidence before him at sentencing regarding the impact Taylor's acts had on the family members of the victims. However, the trial court could not consider that part of the victim-impact evidence regarding the characterization of the crime, the defendant, or the recommendations of an appropriate punishment. Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995[, 116 S.Ct. 531, 133 L.Ed.2d 437] (1995).
"The trial court, after accepting the letters from family members and ascertaining that there were no objections to the documents, stated, `Now, this is not evidence. Make it clear it is simply a bench hearing exhibit offered by the State.' (R. 1618.) Then, before retiring *447 to deliberate on the sentence, the trial judge commented, `I know that everybody wants this hearing to come to a conclusion. At the same time, I am going to follow the law to the letter and in the spirit.' (R. 1632.) Just before pronouncing sentence, the trial judge stated, `The court has considered all materials appropriate for consideration....' (R. 1634.) Trial judges are presumed to know the law and to follow it in making their decisions. Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.1985); Sockwell v. State, 675 So.2d 4, 36 (Ala. Cr.App.1993), aff'd, 675 So.2d 38 (Ala.), cert. denied, 519 U.S. 838[, 117 S.Ct. 115, 136 L.Ed.2d 67] (1996). Our review of the record and the trial court's sentencing order leads us to conclude that there was no plain error. We find absolutely no evidence that the family members' sentence recommendations were considered by the trial court at sentencing. Burgess v. State, 723 So.2d 742, 765 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360[, 143 L.Ed.2d 521] (1999)."
Taylor v. State, supra, at 1167-68. Cf. Stallworth v. State, [Ms. CR-98-0366, Sept. 28, 2001] ___ So.2d ___ (Ala.Crim. App.2001) (the cause was remanded to the trial court to indicate whether it had considered victim-impact evidence in the form of statements by one of the victim's daughters and another victim's husband stating that defendant deserved no mercy and that he should pay for his crime with his life, during the sentencing phase before the trial court, because the cause was due to be remanded on another ground and there was no evidence as to whether the trial court had considered the victim impact statements in determining sentence).
Because there was evidence in the record that the trial court did not consider the sentencing recommendation by the victim's brother in arriving at the appellant's sentence, and no evidence indicating otherwise, there was no reversible error in allowing this testimony by the family member.

VII.
The appellant argues that the trial court improperly impeded his right to cross-examine a State's witness concerning his involvement in criminal activity; specifically, the appellant argues that he should have been allowed to expose the illegal drug activity of a State's witness, Michael Wilson, who had testified that the appellant had confessed to him. The appellant argues that he should have been allowed to reveal the witness's juvenile drug offense to show bias in order to impeach his testimony.
The record indicates that this State's witness, during direct examination, gave cumulative evidence indicating that the appellant had told Latonya Roshell and him of committing this offense. Roshell had already given testimony concerning this admission by the appellant. Moreover, the appellant's girlfriend, the codefendant, had also testified to the appellant's actions in committing this offense. During the cross-examination of Wilson, the following transpired:
"[Defense counsel]: You make your living selling dope, don't you?
"[Wilson]: Naw.
"[Prosecutor]: I object unless he has some basis for
"[Defense counsel]: I do.
"[The Court]: He said `No' did you not?
"[The witness]: Yes. I said `No, I work.'
"[Defense counsel]: You have been to Mt. Meigs for selling dope, haven't you?
"[Prosecutor]: Your Honor, I object to this, Your Honor.

*448 "[The Court]: Sustained.
"[Prosecutor]: It is inappropriate and he knows it is inappropriate.
"[The Court]: Sustained. Go ahead, next question."
The appellant made no offer of proof concerning any juvenile adjudication or that it would be evidence of any particular bias.
In Smith v. State, 795 So.2d 788, 815-16 (Ala.Crim.App.2000), Smith, a capital defendant, argued that the trial court improperly restricted his right to cross-examine a State's witness in order to elicit that she had been adjudicated a juvenile offender and that at the time of trial she was in the custody of a juvenile correctional authority because her probation had been revoked. In finding no error by the trial court for restricting this cross-examination, this Court stated:
"Smith made no attempt to argue that [the State's witness] had made any deal with the State that would result in her being biased. Smith made no offer of proof that the juvenile probation revocation would be proof of bias. We have held that an offer of proof is necessary before we can review a trial court's ruling on the limitation of cross-examination. See M.T. v. State, 677 So.2d 1223 (Ala.Cr.App.1995); Myers v. State, 601 So.2d 1150 (Ala.Cr.App.1992).
"Other jurisdictions have held that because of the restrictive holding of Davis [v. State, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)], and the fact that juvenile records may not be used for impeachment of general credibility, an offer of proof is essential to preserve this issue for an appellate court. In Smith v. United States, 392 A.2d 990 (D.C.Ct.App.1978), the issue before the court was whether the lower court erred in not allowing a State's witness, who had identified the accused as the robber and had picked him out of a lineup, to be cross-examined about the fact that the witness, at the time of trial, was incarcerated in a juvenile facility. The Smith court stated:
"`In the case at bar, counsel for appellant did not proffer, nor does the record indicate any reason why Mr. Thames' juvenile record or place of residence would make his testimony partial or biased. Hence, the proffered cross-examination here was intended simply as a general impeachment of the witness' credibility.
"`There is an inherent difference between cross-examination intended as a general attack on the credibility of a witness and cross-examination directed toward revealing possible bias, prejudices, or ulterior motives of a witness. See Davis v. Alaska, [415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)]; Springer v. United States, [388 A.2d 846] at 855 [(D.C.1978)]; Gillespie v. United States, D.C.App., 368 A.2d 1136, 1137 (1977).'"
Moreover, it is clear that when a witness denies a prior conviction, the impeaching party must prove the conviction and cannot do so by oral testimony. C. Gamble, McElroy's Alabama Evidence, § 145.01(16) (5th ed.1996). The prior conviction can be proved only by introduction of the original court record of the conviction, a certified or sworn copy of it, or certified copies of the case action summary sheets, docket sheets, or other records of the court. Id.
Moreover, even if this limitation of cross-examination by the trial court could have been construed as error, the ruling was harmless. The record indicates that before the testimony of Michael Wilson, during the direct examination of Latonya Roshell, when she was asked how she was *449 working as an informer for the Hoover Police Department, she responded that she was working by following Michael Wilson concerning narcotics because "Michael Wilson was selling narcotics." The prosecutor then asked Roshell if Michael Wilson was "supposed to be selling narcotics," and she responded, "He was selling drugs." Therefore, this evidence was already before the jury. Moreover, the evidence presented by Wilson was cumulative of evidence already presented to the jury. Rule 45, Ala. R.App. P.

VIII.
The appellant argues that the State failed to establish the proper chain of custody when admitting into evidence certain itemsspecifically, a wristwatch and a ring. The appellant argues that the wristwatch was improperly authenticated because, he says, it was never identified as having belonged to the victim and because the watch was taken from the appellant's brother rather than from the appellant. Moreover, the appellant argues that the investigating officer who was testifying during the admission of the wristwatch could not identify the evidence, and therefore it should not have been presented into evidence. As to the ring, the appellant argues that the chain of custody was broken as to this item of evidence because the seal on the envelope in which the ring was contained had been broken, and an officer admitted that she did not know how the ring was maintained once it was stored in the property room.
As to the appellant's arguments concerning the wristwatch, the appellant's mother had previously testified at trial that she could identify the wristwatch as the one the appellant's brother had had when they were instructed to turn the wristwatch over to the police. When asked who had been wearing the watch, she testified that both the appellant and his brother had worn the watch. Moreover, the officer who was testifying when the watch was admitted into evidence initially stated that he did not recall the watch; however, he subsequently indicated that he was present when the watch was accepted from the appellant's brother and was received by the Birmingham Police Department. The appellant made no objection to the admission into evidence of the wristwatch; therefore, the analysis of this claimed error is made pursuant to Rule 45A, Ala. Rules. App. P. There was no plain error in the admission into evidence of the wristwatch, because it was properly identified and authenticated in the record.
As to the ring, an officer testified that she had found the gold ring in the trunk of the victim's car. She stated that it remained in her possession until she turned it over to the property room of the Birmingham Police Department and that it had been maintained in the property room until it was brought to court. She further testified that it was in substantially the same condition as when she took possession of the ring. Although defense counsel elicited testimony from this witness on cross-examination that she did not remain in the property room to guard over the evidence, so that she could not testify that it was not tampered with in the property room, she testified that, although the seal had been broken on the envelope, her initials remained on the envelope in which the ring was kept and were the only initials on the envelope; moreover, she testified that the ring was in the same condition as when she had taken possession of it. The court stated for the record that the seals on this evidence were broken by the Court and by the attorneys at the beginning of trial. Defense counsel acknowledged *450 that the evidence was initially presented still in a sealed condition.
"This Court has established that the State `need only prove to a reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' Sommer v. State, 489 So.2d 643, 645 (Ala.Cr.App.1986). Moreover, the `evidence need not negate the most remote possibility of substitution, alteration, or tampering of the evidence.' Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981). We conclude that the State established a proper chain of custody."
Turner v. State, 610 So.2d 1198, 1200 (Ala. Crim.App.1992). See also Evans v. State, 794 So.2d 415 (Ala.Crim.App.2000).
The chain of custody concerning the ring found in the victim's trunk of her vehicle was sufficient to establish the identity, authenticity, and reliability of this evidence.

IX.
The appellant argues that the trial court's instructions to the jury during the guilt and sentencing phases of his trial denied him of his rights to due process, a fair trial, and a reliable sentencing determination. Specifically, the appellant argues that the trial court failed to give adequate instructions on the necessity that accomplice testimony be corroborated, and failed to give any instruction to the jury on how to consider the testimony of the paid informant. The appellant further argues that the trial court's instructions as to reasonable doubt established a standard that is constitutionally below that required by the due-process clause. The appellant also adds the argument in his brief, by way of a footnote, that the trial court improperly refused to instruct the jury on the lesser-included offense of manslaughter.

A.
The appellant argues that the trial court's instructions on the corroboration of accomplice testimony were inadequate and improper. The appellant argues that, before closing arguments by counsel, the trial court sufficiently instructed the jury concerning the corroboration of accomplice testimony as follows:
"As you know, Angelica Willis is a, I would guess a self-confessed accomplice in the murder component here that we are discussing today of Ms. Johnson having testified in exchange for an offer of a 20-25 year sentence on a plea of guilty of murder.
"Now, the reason I mention this to you, we have a special statute relative to accomplice testimony and it would probably be good for me to go over this with you, maybe paraphrase it. It is entitled Accomplice Testimony for Felony Conviction. And it says in substance that a conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. And such corroborating evidence, if it merely shows the commission of the offense or circumstances thereof, is not sufficient...."
The appellant argues that the trial court erred by stating at the close of these initial instructions to the jury that he would again speak to them following the closing arguments in order to "sum-up" and answer any questions about the important principles; however, following the closing arguments, the trial court did not refer to accomplice corroboration again. The appellant argues that because the trial court did readdress a number of instructions, he drew emphasis away from his instruction concerning the corroboration of accomplice testimony. Moreover, the appellant argues that the trial court's action in instructing *451 the jury before counsels' arguments was improper in itself pursuant to § 13A-5-46(d), Ala.Code 1975, and Duren v. State, 507 So.2d 111, 114-15 (Ala.Crim. App.1986). ("[a]fter hearing the evidence and the arguments of both parties ..., the jury shall be instructed on its function and on the relevant law by the trial judge"). Thus, the appellant argues that the instructions should have been given following the arguments of counsel. It should be noted that the appellant failed to object on these grounds at trial; therefore, any claim of error must be analyzed pursuant to Rule 45A, Ala. R.App. P.
The record indicates that the instruction given by the trial court before the closing arguments of counsel was more extensive than that quoted by the appellant. The trial court continued in its instructions as follows:
"Now, you people decided as jurors and triers of the facts, as I have told you, if sufficient corroborative evidence has been presented to you that makes more certain or confirms or strengthens the incriminating force of the lady's testimony. Corroborative evidence need not be strong nor sufficient in itself to support a conviction. The requirement is that it legitimately tend to connect Willie B. Smith with the offense.
"Sufficient corroboration of the testimony of an accomplice may be furnished by tacit admission of the accused, by his suspicious conduct, by his associating with the accused ... [,] by the defendant's proximity and opportunity to commit the crime. And, of course, by the non-accomplice witness-type testimony that tends to connect a defendant with the offense."
These instructions by the trial court were clearly sufficient to apprise the jury of the law concerning accomplice corroboration; moreover, despite the appellant's argument based on § 13A-5-46(d), Ala.Code 1975, to the contrary, the trial court's actions in instructing the jury before counsel's argument did not constitute plain error. In Grayson v. State, 824 So.2d 804 (Ala.Crim.App.1999), Grayson argued that plain error existed because the trial court, during the sentencing phase, instructed the jury before counsel's arguments and taking of testimony, without reinstructing the jury following the closing arguments. As in the present case, Grayson failed to object to the order of the proceedings. In finding that no error existed as to the argument, this Court stated:
"[T]here are guidelines for the order of proceedings of a trial in Alabama; however, with the agreement of the parties, the Court may direct otherwise. Moreover, it has long been held in this State that `"[t]he trial court is vested with discretion in the conduct of a trial and appellate courts will not interfere therewith unless it appears that there has been an abuse of discretion." Townsell v. State, 255 Ala. 495, 498, 52 So.2d 186, 189 (1951).' Houston v. State, 565 So.2d 277, 279 (Ala.Cr.App.1990). See also Tombrello v. State, 421 So.2d 1319, 1322 (Ala.Cr.App.1982); Carson v. State, 49 Ala.App. 413, 272 So.2d 619, 622 (1973).
"`It has often been stated by this court that:
"`"The trial judge, as a natural consequence of his position and the many duties devolving upon him, is necessarily vested with much discretion in the conduct of the trial of causes, and, unless it clearly appears that there has been an abuse of this discretion, appellate courts will not interfere to control such discretion, but will presume that one occupying so important a position as that of circuit judge will accord to all litigants in his court a fair and impartial trial provided *452 for in the Constitution of this state...." Dennison v. State, 17 Ala. App. 674, 88 So. 211.'

"Lockett v. State, 50 Ala.App. 58, 62, 276 So.2d 643, 646 (1973).
"Thus, in other states where the trial procedure is established by statute, courts have held that any deviation from the statutory order of proceedings is a matter within the sound discretion of the trial judge `"and any claim that a judge erred in following the statutorily mandated order of proceedings must sustain a heavy burden to demonstrate the unfairness and prejudice...."` State v. Evilsizor, [No. 94 CA 11, September 28, 1994](Ohio Cr.App.1994) (unpublished) (wherein the Court held that the defendant had not demonstrated any unfairness or prejudice resulting from the trial judge's decision to forego opening and closing statements, especially where neither party requested to make such a statement.) See State v. Lorenzo, [No. 52640, January 7, 1988](Ohio Cr.App. 1988) (unpublished); Ohio v. Johnson, [C-840346, C-840379, February 27, 1985] (Ohio Cr.App.1985) (unpublished).
"`Courtroom procedures for the most part are dictated by statute and court rules, as well as by Constitutional requirements; but, in addition, the trial court has inherent authority, unless other-wise specifically precluded, to control the conduct of the proceedings before it, in order to insure that the proper decorum and appropriate atmosphere are established, that all parties are treated fairly, and that justice is done. See Guaranty Dev. Co. v. Liberstein, 83 A.2d 669, 671 (D.C.1951) ("[i]t is a well-settled rule that the mode of conducting trials ... [is a] matter [ ] belonging very largely to the practice of the court"); 75 AM. JUR. 2D Trial § 180 (1991). Indeed, innovative trial procedures are acceptable as long as they "are administered carefully and meet the requirements of due process." United States v. Lewis, 230 U.S.App. D.C. 212, 219, 716 F.2d 16, 23, cert. denied, 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1983) (sustaining trial of several criminal cases simultaneously before two juries absent evidence indicating dual jury causes specific prejudice to a defendant).'

"Hicks-Bey v. United States, 649 A.2d 569, 575 (D.C.App.1994)."
Grayson v. State, 824 So.2d at 840-41.
In the present case, the trial court sufficiently charged the jury as to the applicable law; no plain error resulted from his procedural decisions as to when to instruct the jury.
Nor is there any indication in the record that this concept would have been given insufficient emphasis by not being repeated at the close of the argument. The decision whether to repeat certain instructions to the jury is a matter generally left to the trial court's discretion. See Parsons v. State, 251 Ala. 467, 480, 38 So.2d 209 (1948) (this Court found that "[i]t was in the discretion of the court to give more emphasis to the question of [the defendant's] consent," by repeating certain charges in response to a question by the jury and refusing submitted charges by the defendant). See also Flowers v. State, 402 So.2d 1118, 1119 (Ala.Crim.App.1981) (the trial court repeated certain instructions to the jury and refused to recharge the jury as to certain instructions that defense counsel requested be reread to the jury). See also Thomas v. State, 455 So.2d 278, 281 (Ala.Crim.App.1984) (the practice of repeating instructions to the jury pursuant to questions from the jury does not place added weight or undue emphasis on that portion of the charge). A review of *453 the entire charge reveals that the jury was properly instructed as to the law concerning the corroboration of accomplice testimony and its importance was not diminished to the jury because the trial court failed to repeat these instructions at the close of the parties' arguments.

B.
The appellant argues that the trial court's failure to instruct the jury concerning how to consider the testimony of Latonya Roshell as a paid informant constituted reversible error. The appellant acknowledges that the trial court gave a general instruction concerning how to evaluate certain witnesses' testimonies in light of biases they may have; however, he argues that because there was not a special cautionary instruction as to Roshell's testimony as an informant paid by the government for her involvement in the case, the trial court committed reversible error. The record indicates that the appellant failed to raise this issue at the trial court level; therefore, it must be analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
The record clearly indicates that the trial court's charge completely addressed the subject of witness credibility and bias; therefore, there was no error in refusing to give the requested instructions. Walters v. State, 585 So.2d 206 (Ala.Crim. App.1991) (requested charge as to testimony from a witness under the promise of immunity or hope of reward in a drug prosecution was properly refused as it had been substantially covered by instructions as to the credibility of witnesses and conflicting testimony). See also Felder v. State, 697 So.2d 490 (Ala.Crim.App.1996) (trial court was not required to give instructions requested by defendant concerning the credibility of an informant where trial court's instructions as to witness credibility were adequate). In the present case, there is no indication that the jury was not aware of its ability to weigh the evidence and to believe or disbelieve the witnesses' testimony.

C.
The appellant argues that the trial court's instructions as to reasonable doubt were improper and misleading and that they were burden-shifting and required a lesser standard by referring to the jury's "collective minds" rather than stating that each and every juror must be convinced beyond a reasonable doubt. The record indicates that, after the trial court had given its entire charge both before and after arguments of counsel at the guilt phase of trial, defense counsel objected to the trial court's charge as to reasonable doubt; specifically, defense counsel referred to the court's instruction that "if after listening to the evidence either you have an abiding conviction that he is guilty, then in fact he is guilty" as diminishing the standard for reasonable doubt. On appeal, the appellant pulls out of context two phrases the trial court used in his charge to the jury. The record indicates that the trial court charged the jury as to reasonable doubt as follows:
"On the criminal side, though, the burden of proof is higher. The State has a more onerous burden or as expressed by that phrase that you had heard Monday so many times, the State has to prove guilt by strong and cogent evidence that convinced you people beyond a reasonable doubt or to a moral certainty of Mr. Smith's guilt here before the presumption of innocence is overcome and thus before you would be authorized to convict. So, again, the State must prove guilt by strong and cogent evidence that convinces you people beyond a reasonable doubt of guilt.

*454 "The State does not have to prove guilt to a mathematical certainty.
"I will say this: If after a full and fair consideration of all of the evidence in the case, if there should remain in your collective minds a conviction that Willie B. Smith here is guilty of the offense or offenses charged, then you would be convinced by that full measure of proof required in the law, you would be convinced beyond a reasonable doubt or to a moral certainty and you should convict.
"On the other hand if after that same full and fair consideration of all of the evidence in the case, if there does not remain in your collective mindsthe verdict has to be unanimous, as I will say again in a little bitif there does not remain in your collective minds an abiding conviction that he is guilty, then that is another way of saying I'm not convinced by that full measure of proof that the judge is talking about and the man should be acquitted.
"A reasonable doubt may spring from the evidence that was adduced in court. A reasonable doubt may spring from a lack of sufficient and satisfying evidence. And indeed a reasonable doubt may spring from any part of the evidence.
". . . .
"The State has the burden of proof. The burden of proof does not shift to the defendant at any point in the litigation.
"We talked at great length about the quantum of proof on the criminal side, the State having to prove guilt beyond a reasonable doubt or to a moral certainty.
". . . .
"Stated a bit differently, if after considering all of the evidence in the case as measured against the applicable legal principles that we have been discussing, if your minds are left in a state of doubt or confusion of whether or not Willie Smith is guilty or if the evidence reasonably permits either of two conclusions, one of innocence and one of guilt, then, of course, you would adopt the theory of innocence and the man will be acquitted.
"Do remember that a reasonable doubt is a doubt which would entitle defendant Smith to an acquittal is not a mere fanciful doubt, vague or conjectural, but a reasonable doubt arising from the evidence and remaining after a consideration of the testimony and the litigation."
These instructions by the trial court as to reasonable doubt were not improper as diminishing the reasonable standard of proof by shifting the burden of proof from the State. The exact terminology complained of by the appellant in the above-stated charge, "collective minds" of the jury and the instruction referring to a lack of an abiding conviction of the defendant's guilt requiring a finding of not guilty, have previously been held proper in a jury instruction by the Alabama Supreme Court. Ex parte Brooks, 695 So.2d 184, 192 (Ala. 1997). In Brooks, Brooks claimed that the trial court had committed reversible error in its charge concerning reasonable doubt by giving the charge that reduced the State's burden of proof and could have caused a reasonable juror to believe that the degree of proof to convict was lower than that required by the Constitution. The complained of charge in Brooks was as follows:
"`On the other hand, if after the same full and fair consideration of all of the evidence in this case, if there does not remain in your collective minds here an abiding conviction that he is guilty, then you would not be convinced by that full measure of proof required in the law and he should be acquitted.'"
Id. The Alabama Supreme Court noted that this language did not violate Cage v. *455 Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and that "in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the United States Supreme Court held that an instruction cast in terms of an abiding conviction as to guilt correctly states the prosecutor's burden of proof." 695 So.2d at 192, citing Alexander v. State, 601 So.2d 1130 (Ala.Crim.App. 1992).
Similarly, there is no error in the present case as to the trial court's charge on reasonable doubt.

X.
The appellant argues that the prosecutor made improper arguments to the jury during the guilt and sentencing phases of his trial. He alleges that these arguments addressed: "Impeding the jury's role in assessing the credibility of witnesses, bolstering the credibility of the state witnesses, commenting on facts that were not in evidence, making comments about the victim that were intended to inflame the jury and indirectly commenting on Mr. Smith's choice not to testify."

A.

Improper Arguments During the Guilt Phase of the Appellant's Trial
The appellant cites to three arguments by the prosecutor during his closing argument at the guilt phase that he argues were reversible error.

1.
The appellant argues that the prosecutor misled the jury concerning its role in assessing the credibility of witnesses by making the following argument:
"And His Honor told you about lying to you about a material fact. Was it material whether or not he dealt drugs? Was it material about whether or not this Tech 9 was his? No, that's not material, it's a smoke screen to take your mind off what is material.
"Ms. Sharma Ruth Johnson was not killed by an overdose of drugs. Ms. Sharma Ruth Johnson was not killed by a Tech 9. Ms. Sharma Ruth Johnson was killed by a shotgun. So, is that material whether or not that Tech 9 was his or he dealt drugs?"
The appellant did not object to this argument by the prosecutor at trial; therefore, it must be analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
There was no plain error as to this argument by the prosecutor. "The credibility of witnesses is a proper subject for arguments to the jury. Price v. State, 725 So.2d 1003, 1029 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998)." Smith v. State, [Ms. CR-97-1258, Dec. 22, 2000] ___ So.2d ___,___ (Ala.Crim.App.2000).
"In Price v. State, 725 So.2d 1003 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), we held as follows:
"`There was no impropriety by the prosecutor in making these comments because they were grounded in the evidence and were proper inferences from the evidence; moreover, the credibility of witnesses is proper subject matter for arguments to the jury. In Cross v. State, 536 So.2d 155 (Ala. Cr.App.1988), the district attorney, in closing argument to the jury, stated that the defendant's son had lied and that a deputy sheriff had told the truth, further commenting that the deputy sheriff had no reason to lie. This Court noted that the testimonies of defense witnesses and the deputy sheriff, who was the State's witness, were in conflict and were properly *456 opened to comment during closing argument. This Court stated:
"`"[T]he testimony was in evidence and the prosecutor could comment on this, since her comments were supported by the evidence. Moreover, the credibility of a witness is a legitimate subject of comment during closing arguments. In Milton v. State, 417 So.2d 620 (Ala.Cr.App.1982), the prosecution called the appellant's witness a `blatant liar'; we held that the prosecutor's argument or comment was within the scope and limit of argument, because the argument went to the credibility of the witness. 417 So.2d at 623. In Clark v. State, 462 So.2d 743, 747 (Ala.Cr.App.1984), we held that when a party places a witness on the stand, he vouches for his credibility, but does not personally vouch for the witness. In the case at bar, the prosecutor was arguing to the jury as to the effect of the witness's testimony, but was not personally vouching for [the witness's] credibility.
"`"Therefore, the trial court did not err in allowing the prosecution to attack the credibility of the appellant's witness, nor did the prosecutor personally vouch for the credibility of the State's witness."
"`536 So.2d at 159-60. See also Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).'"
Wilson v. State, 777 So.2d 856, 902 (Ala. Crim.App.2000), aff'd, 777 So.2d 935 (Ala. 2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001).
Thus, there was no error in allowing the prosecutor to argue that certain evidence introduced by the appellant was an immaterial smoke screen, as the prosecutors are allowed to make any inferences and deductions from the evidence, nor was it improper as an attempt to mislead the jury concerning its role in assessing the credibility of witnesses.
The appellant further argues that the prosecutor attempted to improperly bolster witness testimony by allegedly giving latent assurances that he had been truthful in other parts of his testimony; specifically, when the prosecutor argued as follows:
"What was material is what the defendant told Michael Wilson sometime thereafter or early month of November, `I did some madness and I have to get off this side of town.' That was what was material...."
The appellant argues, concerning this remark, that it left "little way for the jury to discern whether Mr. Wilson's entire testimony should be disregarded." The appellant argues that this comment led the jury to believe that while the witness may have been untruthful during parts of his testimony, "the jury could be assured that Mr. Wilson testified truthfully about Mr. Smith's involvement in the crime."
This comment by the prosecutor was not improper. In Wilson v. State, 777 So.2d 856, 902 (Ala.Crim.App.1999), Wilson argued that the prosecutor had improperly vouched for the credibility of his witnesses during his closing argument. This Court found no error in counsel's arguments, noting that the comments were grounded in the evidence and were proper inferences to be drawn from the evidence; moreover, the prosecutor was not making a personal guarantee as to the credibility of the State's witness. See also Harris v. State, 632 So.2d 503 (Ala.Crim.App.1992) (this Court found no plain error in the comment by the prosecutor during his closing argument at the guilt phase that a State's witness had no reason to lie and that another State's witness had nothing to gain, as these comments were proper inferences from the evidence). In the present case, *457 the prosecutor was also making proper inferences from the evidence in his statement concerning Michael Wilson's testimony.

2.
The appellant also argues that the prosecutor commented on facts which were not in evidence by making the following statement during his closing argument at the guilt phase:
"Steve Corvin testified that he was the officer in charge of the case. Testified, got numerous reports associated with people who thought they could identify the person, numerous reports from Crimestoppers."
The appellant argues that this comment was improper because the officer never testified that he had received reports from Crimestoppers. The appellant argues that the only mention of Crimestoppers in the trial related to Roshell's receipt of $500 from Crimestoppers in exchange for her assistance in apprehending the appellant. The record indicates that the appellant failed to object on this ground at trial; therefore, this alleged error must be analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
The record indicates that after he had finished testifying, Officer Steve Corvin was recalled as a witness by the State so that the chain of custody could be finalized as to a certain item of evidence in order to properly admit it. The witness was then cross-examined concerning this item of evidence, the jacket, as to where the officer had gotten his information and whether other people had informed him that they had a jacket similar to the one to be admitted. During this cross-examination, defense counsel asked for a "ballpark figure" as to "how many tips you all received." When Officer Corvin responded that he did not have a ballpark figure, defense counsel questioned him as to whether they had received more than 20 tips. The witness responded, "Yes, sir, probably so." Defense counsel then stated, "And probably way on up over that?" The witness responded, "Yes, sir." Thus, the prosecutor had properly argued that State's witness Steve Corvin had testified that the police had received a number of reports and tips concerning this offense. Although he did not testify that the tips came specifically from Crimestoppers, any error in citing that source would clearly be harmless. Rule 45, Ala. R.App. P.

B.

Improper Comments at the Sentencing Phase of the Trial
The appellant cites to two arguments by the prosecutor made during the sentencing phase of the trial, which he alleges were highly improper and inflammatory; specifically, the appellant argues that the prosecutor made improper arguments concerning the impact of the crime on the victim's family and indirectly commented on the appellant's choice not to testify.

1.
The appellant argues that the prosecutor improperly presented evidence concerning the impact of the victim's murder on the victim's family. Thereafter, during closing argument at the sentencing phase, the prosecutor argued as follows:
"Ladies and Gentlemen of the jury, there are people that love Sharma Ruth Johnson also because she was somebody's daughter, because she was somebody's sister, because she was somebody's friend...."
The appellant argues that these comments created a prejudicial atmosphere that rendered the jury's death sentence unreliable. However, the appellant failed to object to this matter at trial; therefore, any alleged *458 error must be analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
These comments by the prosecutor did not focus on the effect on the family; rather, they refer to "`matters already obvious to any juror.'" Kuenzel v. State, 577 So.2d 474, 507 (Ala.Crim.App. 1990). "Furthermore, victim impact argument is not prohibited at the penalty phase of the trial. Hutcherson v. State, 727 So.2d 846 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998); Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. [1079], 117 S.Ct. 742, 136 L.Ed.2d 680 (1997)." Frazier v. State, 758 So.2d 577, 604 (Ala.Crim.App.1999). The prosecutor could properly comment on the victim's lost roles as a family member and a friend during closing arguments at the sentencing phase of the trial.

2.
The appellant argues that the prosecutor made indirect comments on his choice not to testify through the following two comments made by the prosecutor at his closing argument during the penalty phase of trial:
"I see no remorsefulness. I see no remorsefulness now, probably no remorsefulness then, and probably never will be any remorsefulness."
"And he sits here and does not shed one tear, not even one tear for his mother sitting on this stand begging for his life. All he can do is close his eyes...."
In Ex parte Loggins, 771 So.2d 1093, 1099 (Ala.2000), Loggins argued that the prosecutor had made improper comments during his closing argument in the penalty phase of the trial by stating: "`And throughout every word you've heard from this witness stand in this courtroom this entire week has there been an iota of remorse? None. Absolutely none.'" Loggins argued that this argument by the prosecutor constituted a direct comment on his failure to testify. The Alabama Supreme Court found no merit to this argument stating:
"Not every comment that refers or alludes to a nontestifying defendant is an impermissible comment on his failure to testify; the prosecutor has a right to comment on reasonable inferences from the evidence:
"`"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference. Rutledge v. State, 523 So.2d 1087 (Ala. Crim.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, no fixed standard can be applied, and each case must be judged on its own merits. Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988)."
"`. . . .
"... Moreover, remorse is also a proper subject of closing arguments. Dobyne v. State, 672 So.2d 1319, 1348-49 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).
"`. . . .
"... Harris v. State, 632 So.2d 503, 536 (Ala.Crim.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (wherein this Court held that a reference, during the sentencing stage *459 of the trial, to the defendant's lack of remorse was not improper argument, where testimony introduced at trial had indicated that the defendant's reaction to being informed of her husband's death was so unemotional that she was questioned concerning her reaction); Dobyne, supra, 672 So.2d at 1348-49 (wherein this Court held that a prosecutor's comment regarding the defendant's lack of remorse, made during the penalty phase of the trial, was a comment `on the [defendant's] demeanor when he made his statement to police')."
Ex parte Loggins, 771 So.2d at 1101-02.
Examining this comment made by the prosecutor in the context of his entire argument, it is clear that he was referring to the appellant's demeanor and was drawing inferences and conclusions from the evidence. Testimony was presented that the appellant bragged that he had shot the victim. This comment could not reasonably be interpreted to be an indirect comment on the appellant's failure to testify; therefore, there was no error on this ground.

XI.
The appellant argues that the trial court improperly restricted his ability to cross-examine the codefendant, Angelica Willis, about her plea agreement. The record indicates that the following occurred during the cross-examination of Angelica Willis:
"Q. And you have talked to your defense lawyer, didn't you?
"A. Yes, I have.
"Q. Who negotiated an excellent deal for you
"[Prosecutor]: I am going to object
"Q. and doing a good job, isn't that right?
"The Court: Sustained."
A review of the record indicates that at the commencement of Angelica Willis's direct examination, testimony was elicited by the prosecutor that she was originally charged with capital murder and entered into an agreement with the State to testify against the appellant, and in return she agreed to plead guilty to murder and receive a 25-year sentence. The record further reveals that, following defense counsel's attempted questioning of this witness concerning her plea agreement, defense counsel again elicited testimony concerning the witness's plea agreement as follows:
"Q. So you are pleading guilty to murder when in fact you were forced to participate in it, is that right?
"A. It was in my best interest.
"Q. It was in your best interest. Oh, so you deny any guilt, then?
"A. I feel guilty about what happened.
"Q. But you denyare you going to tell the judge I'm guilty when he has to take your plea?
"A. I feel guilty about what happened.
"Q. I understand that, ma'am. But, are you going to tell the judge I'm guilty when he takes your plea?
"A. I pleaded not guilty.
"Q. You pleaded not guilty?
"A. That's correct.
"Q. And you have pleaded not guilty all the way up to a couple of days ago when you decided that they are trying Willie Smith and I may be next and the government is offering you a deal, isn't that right?
"A. I took the offer that was given to me because it was in my best interest.
"Q. That's right, that's exactly right."
Defense counsel then repeatedly stated that the witness acted in her best interest by entering the plea and by "tell[ing] a *460 pack of lies on the person who brought me in and fed me and took care of my baby."
Thus, a review of the entire record as to the questioning of Angelica Willis demonstrates that she was thoroughly examined concerning her plea agreement and her resulting bias.
"[I]t is well settled that `a defendant has a right to cross-examine an accomplice as to the nature of any agreement he has with the government or any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1109-10, 39 L.Ed.2d 347 (1974).' United States v. Barrett, 766 F.2d 609, 614 (1st Cir.) (emphasis added [in Starks]), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). If the accomplice has entered into a plea bargain agreement with the State, `the full terms of this agreement must be allowed to be placed before the jury.' Dawkins v. State, 494 So.2d 940, 943 (Ala.Cr.App. 1986) (emphasis added [in Starks ]). The accomplice's agreement with the State has bearing on his credibility and bias. Id. Additionally, the terms of the agreement provide the jury with an `understand[ing] of the possible motivations of the accomplice as he sits on the stand.' State v. Donelson, 302 N.W.2d 125, 131 (Iowa 1981), quoted with approval in Dawkins v. State, 494 So.2d at 943. Moreover, where, as in this case, the accomplice is a key witness, the trial court has little, if any, discretion to curtail an accused's attempts to show bias or motive on the part of the witness. See Jones v. State, 531 So.2d 1251, 1254 (Ala.Cr.App.1988); Proctor v. State, 331 So.2d 828, 830 (Ala.Cr.App.1976)."
Starks v. State, 594 So.2d 187, 197 (Ala.Cr. App.1991).
However, in the present case, the terms of Willis's plea agreement were before the jury. Defense counsel was allowed to cross-examine the witness extensively about the agreement and made the jury "fully aware of the possible influences that the plea agreement could have had on [Willis's] testimony. The jury was free to reject [Willis's] testimony. It chose not to do so." Wilson v. State, 690 So.2d 449, 462 (Ala.Crim.App.1995). See also Allen v. State, 611 So.2d 1152 (Ala.Crim.App.1992).

XII.
The appellant argues that his post-arrest statement to police informant, Latonya Roshell, was obtained in violation of his Sixth Amendment right to counsel and Alabama law. Specifically, the appellant refers to the telephone conversation he had from jail with Latonya Roshell, who was a paid informant, in which he made certain incriminating statements that Roshell reported to the police. The appellant argues that because his right to counsel had attached, the statements were obtained and admitted into evidence in violation of his constitutional rights.
However, the record indicates that evidence concerning this telephone call revealed that the appellant telephoned Roshell from the jail on Thanksgiving Day. Roshell testified that it was a three-way call so that his mother was also on the telephone, as well as his sister and his cousin. She testified that the appellant talked about many things and stated that "it was only three people that could have fucked him up" and he indicated that it was either Roshell, Jermaine Norman, or Michael Wilson. He then stated he had "a feeling" that Roshell had done it. Roshell testified that he then stated that "he knew he did it and I knew he did it but he wasn't going to go to court and tell the judge that he did it." Roshell testified that she then *461 telephoned the police to report the telephone call and subsequently, after the preliminary hearing in this case, she received $500 from Crimestoppers. She testified that when she called the police she did not know that there was a reward. She testified on cross-examination that she had been working with the Hoover Police Department giving them information for a few months at the time of the telephone call. She further testified that she had not heard anything about this case. She was subsequently recalled as a witness and on direct examination testified that, after she received the telephone call, she telephoned Steve Corvin with the Birmingham Police Department and reported the conversation on the Monday following Thanksgiving.
In Bates v. State, 549 So.2d 601, 604-08 (Ala.Crim.App.1989), Bates argued that a statement he made to the victim's wife should have been suppressed because he alleged that she had been acting as an agent of the police and, although the appellant was in jail, he was given no Miranda warnings, and that his statement was involuntary. The victim's wife had received several telephone calls from the appellant while he was in jail. She informed the sheriff's department of the telephone calls and an investigator responded by asking if she would continue talking to the appellant so that he would, hopefully, admit to the shooting. The victim's wife was then "tapped" by police officials and the appellant began writing to her. When the victim's wife asked the investigator what she should do concerning the letters, he stated that "`it would be nice if he [the appellant] would write admitting that he had done the shooting.'" After Bates was released on bond he began visiting her house and, eventually, during one visit told her that he had shot the victim and that he had enjoyed doing it. The victim's wife then reported this conversation to the district attorney's office. In Bates, the Court found that the victim's spouse was acting as an agent of the police; however, the statement was not inadmissible as a violation of the appellant's due process rights. The Court found no violation of the appellant's right to privacy under the Fourth Amendment, noting that "`[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" 549 So.2d at 605, quoting Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Similarly, in the present case, the appellant suffered no violation of his right to privacy as he initiated the telephone call during which he threatened the person who had revealed his actions and again admitted that he had committed the murder.
Furthermore, in Bates, the Court found no violation of Miranda or the Fifth Amendment as to the voluntariness of the statement.
"This type of `false friend' situation, `that in which by deception the defendant is made unaware that the person with whom he is conversing is a police officer or police agent, clearly does not make the defendant's statement involuntary even though he acted in the mistaken impression that this person could be trusted not to reveal it.' LaFave and Israel, Criminal Procedure, Vol. 1 (1984), § 6.2(c). There was no coercive police activity which would have overborne the appellant's will and made his confession not the product of rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)."
Bates, 549 So.2d at 606. Similarly, in the present case, the appellant's statement *462 was not involuntary simply because he was unaware that Roshell had worked as an informant with the Hoover Police Department and that she would inform the Birmingham Police Department about his confession.
Moreover, in Bates, this Court found that Bates's statement was not introduced into evidence in violation of his Sixth Amendment right to counsel, because the victim's wife did not "`deliberately elicit'" his incriminating statements. This Court in Bates distinguished those facts from those in United States v. Henry, 447 U.S. 264, 271, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In Henry, the United States Supreme Court held the appellant's statements inadmissible, noting that the Court in Henry "found noteworthy the fact that the agent `was not a passive listener; rather, he had "some conversations with [the defendant]" while he was in jail and [the appellant's] incriminatory statements were "the product of this conversation."`" Bates v. State, supra, at 607. In Bates, as in the present case, the agent (or possible agent) was a passive listener; Roshell even responded that she said nothing in response to the appellant's threat or confession. This Court, in Bates, also looked to the United States Supreme Court's decision in Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986):
"`As our recent examination of this Sixth Amendment issue in [Maine v.] Moulton[, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)] makes clear, the primary concern of the Massiah [v. U.S., 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)] line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated wheneverby luck or happenstancethe State obtains incriminating statements from the accused after the right to counsel has attached," 474 U.S., at 176, [106 S.Ct. at 487] citing United States v. Henry, supra, [447 U.S.] at 276[, 100 S.Ct. at 2189] (Powell, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statement to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.'
"477 U.S. at 459, 106 S.Ct. at 2630. In determining that the police agent did not `deliberately elicit' the incriminating statements, the Court noted that the agent never asked the appellant any questions concerning the pending charges, but merely listened to the appellant's spontaneous and unsolicited statements. In the present case, the record indicates that the appellant's admission was not made in response to any questions by [the victim's ex-wife], but was rather a spontaneous and unsolicited statement of guilt. Therefore, we find that the appellant's right to counsel was not violated."
Bates v. State, supra, at 607.
Finally, Roshell's testimony concerning the appellant's statement was not introduced into evidence in violation of the appellant's due process rights. In Bates v. State, supra, at 607-08, this Court found that Bates's rights to due process were not violated by the admission of his inculpatory statement made to the victim's ex-wife, and quoted Hoffa v. United States, 385 U.S. at 311, 87 S.Ct. 408, in which the United States Supreme Court held that "the use of a government informer under similar circumstances was not `a shabby *463 thing in any case'." Bates v. State, supra, at 607. The United States Supreme Court further noted that the use of secret informers "is not per se unconstitutional," and that the safeguards of our "legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." Hoffa v. United States, 385 U.S. at 311, 87 S.Ct. 408.
In the present case, although Roshell had been working for two weeks as a government informer with the Hoover Police Department, the police had not solicited her help with the present case, nor did she elicit the incriminating statement from the appellant. Nor was there any deception or custodial interrogation initiated by law-enforcement officers that would have denied him of his Fifth Amendment rights. He was not deprived of his right to privacy, due process, or right to counsel by the admission into the evidence of his telephone confession to Roshell. See also Gilchrist v. State, 585 So.2d 165, 174-78 (Ala. Crim.App.1991); Hagood v. State, 588 So.2d 526, 534-36 (Ala.Crim.App.1991).

XIII.
The appellant argues that the trial court improperly prohibited him from cross-examining Officer Corvin about his police investigation, specifically information that Officer Corvin received tips concerning other individuals who owned a jacket similar to that which the appellant allegedly wore on the night of the offense. The appellant asserts that when the district attorney objected on hearsay grounds to this testimony, the trial court sustained; however, the appellant alleges that this testimony would have indicated how the investigation was affected by the conversations rather than constituting hearsay. However, a review of the record indicates that the appellant was attempting to elicit testimony concerning what this third party had actually said rather than what actions Officer Corvin took as a result of any conversations that he had had with this third party. The following transpired during the cross-examination of Officer Steve Corvin:
"Q. Sir, you all interviewed quite a few people in regards to this crime, did you not?
"A. Yes, sir, we did.
"Q. You had suspects, and so forth?
"A. Yes, sir.
"Q. Do you remember interviewing an Angelica Thomas?
"A. Yes, I do.
"Q. And isn't it a fact that she said
"[Prosecutor]: I object to what she said, Your Honor.
"The Court: Sustained.
"Q. Did you get information in your investigation that other people may have had a jacket similar to this?
"[Prosecutor]: Same question, Your Honor. It is hearsay.
"The Court: Sustained.
"[Prosecutor]: He had an opportunity
"[Defense counsel]: Can I approach the bench, if I may?
"The Court: Sure."
Thereafter, a hearing was held in the judge's chambers, wherein the following occurred:
"[Defense counsel]: Judge, we have a situation where this girl called and said that she was positive it was her boyfriend'she had a jacket just like it, looked like him. We asked the district attorney's office for her address and never got it.
"[Prosecutor]: Wait a minute, it's on her tape.

*464 "[Defense counsel]: But her current address.
"[Prosecutor]: I don't know her current address. I mean, I gave you everything I had, [defense counsel]. I gave you her tape, I gave you her statement, I gave you everything I had.
"The Court: There must be a number of jackets, what do you call them
"[Defense counsel]: Yes, sir, there is. This girl said she had one just like it.
"[Second defense attorney]: This woman said over and over again she was positive that it was her boyfriend's
"The Court: Did they make an arrest?
"[Defense counsel]: No.
"The Court: Did they talk to the boyfriend?
"[Defense counsel]: I think they did.
"The Court: Can't let it in, [defense counsel].
"[Defense counsel]: We can get an instanter for her, then, I guess for our case.
"The Court: If you can find her, give me a decent address and I'll try to help you.
"[Defense counsel]: All right."
Defense counsel clearly was attempting to introduce the third party's statement for the truth of the matter asserted; specifically, that her boyfriend owned the same jacket and that he looked like the appellant. No reasonable interpretation of defense counsel's discussion concerning this statement would indicate that he sought to elicit how the statement affected the investigation, nor did he make any request for such a limiting instruction by the trial court. Thus, the trial court properly sustained the State's objection as to hearsay. C. Gamble, McElroy's Alabama Evidence (4th ed.1991), § 242.01(1).

XIV.
The appellant argues that the prosecutor's use of peremptory strikes to exclude African-American and Hispanic veniremembers violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Alabama law. Specifically, the appellant argues in brief that "it is unclear whether the district attorney used his peremptory strikes in a racially discriminatory manner because the trial court improperly speculated about what the reasons were." A review of the record concerning the appellant's challenges made pursuant to Batson v. Kentucky, supra, indicates that he based these challenges on gender, see Smith v. State, 698 So.2d 1166 (Ala. Crim.App.1997), and race. However, the appellant argued almost exclusively concerning the gender discrimination. As to racial discrimination, the appellant alleged only that the prosecutor struck five black veniremembers. Defense counsel stated that the prosecutor had a history of reversals based on racial discrimination in the jury selection process; however, the trial court refuted that claim and stated, "I don't agree with that, I really don't." The trial court then stated, "This is [prosecutor], a very prominent black attorney ... [t]hat I have worked with and you have too." The trial judge then acknowledged that he had sat on the bench for 10 years and that he did not believe that a prima facie case of racial discrimination based on peremptory challenges had been shown in this case. He pointed out certain answers or characteristics of some of the veniremembers who were struck and then stated, "[W]ell, I don't want to say too much because you will say I am putting words in their mouths."
As to the single Hispanic veniremember, the record indicates that she was struck by the prosecutor, and that he struck her as his no. 7 strike, although he had asked her no questions.
*465 The appellant failed to establish a prima facie showing of discrimination by the prosecutor as to his strikes against black veniremembers.
"`In Batson, the United States Supreme Court held:
"`"Although a prosecutor is ordinarily entitled to exercise permitted peremptory challenges `for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, ... the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."
"`476 U.S. at 89, 106 S.Ct. 1712 (citations omitted.)
"`The Court went on to outline the components of a defendant's prima facie case of racial discrimination:
"`"To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the [veniremembers] from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination."
"`Batson, 476 U.S. at 96, 106 S.Ct. 1712 (citations omitted).
"`... In Strauder v. West Virginia, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880), the Court held that racial discrimination in jury selection offends the Equal Protection Clause; however, it recognized that a defendant has no right to a jury composed in whole or in part of persons of his own race.
"`A defendant making a Batson challenge bears the burden of proving a prima facie case of purposeful or intentional discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987). Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the State give its reasons for its peremptory strikes. Stokes v. State, 648 So.2d 1179, 1180 (Ala.Crim.App.1994).
"`. . . .
"Procedurally, the party alleging racial discrimination in the use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). `"[I]t is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find a prima facie case"` of racial discrimination. Mitchell v. State, 579 So.2d 45, 48 (Ala.Cr.App.1991), cert. denied, 596 So.2d 954 (Ala.1992), quoting United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990)."
McElemore v. State, 798 So.2d 693, 695-96 (Ala.Crim.App.2000), cert. denied, 798 So.2d 702 (Ala.2001).
*466 In the present case, the prosecutor was not required to come forward with reasons, because the trial court found that there was no prima facie case of discrimination as to the striking of the black prospective jurors. Therefore, any error by the trial court in supposing reasons for certain of the strikes was harmless. Rule 45, Ala. R.App. P. Moreover, the trial court properly found that there was no prima facie case of discrimination in that the appellant presented none of the cited types of evidence that would support an inference of discrimination, rather than the fact that five black potential jurors were struck. Numbers alone are insufficient to raise an inference of discrimination. Hood v. State, 598 So.2d 1022, 1023 (Ala.Crim. App.1991).
As to the prosecutor's striking of the only Hispanic member of the venire, the appellant also failed to make a prima facie showing of discrimination. Because there was only one Hispanic member of the venire, no pattern of discrimination existed that would imply discriminatory intent on the part of the prosecutor; moreover, the prosecutor did not strike this veniremember until his seventh strike. There is further no indication from the questioning of the prosecutor of the veniremembers, contained in the record, which would indicate that the prosecutor intended to discriminate. Moreover, the trial court, in his response to these Batson motions by defense counsel, clearly indicated that, based on his presence in the courtroom for the present case, as well as his prior experience, he did not believe that the prosecutor was intending to discriminate.
Furthermore, because the appellant's Batson motion concerning the striking of the one Hispanic potential juror was based solely on the fact that he was asked no question by the prosecutor, the appellant failed to establish a prima facie case, as this Court has held that such facts alone do not create a sufficient inference of discrimination. Edwards v. State, 628 So.2d 1021, 1024 (Ala.Crim.App.1993).
"It is within the discretion of the trial court to determine if the State's peremptory challenges were motivated by intentional racial discrimination, and the trial court will be reversed only if its determination is clearly erroneous. Ex parte Lynn, 543 So.2d 709 (Ala.1988)."
Bone v. State, 706 So.2d 1291, 1299 (Ala. Crim.App.1997).
The record indicates that, along with the rest of the veniremembers, the Hispanic potential juror was asked questions, although she failed to respond to any of these questions. The trial court's decision that the prosecutor did not act in violation of Batson v. Kentucky, supra, as to these strikes was not clearly erroneous.

XV.
The appellant argues that the trial court erred in refusing to allow him to use jury questionnaires during the jury selection process.
In Harris v. State, 632 So.2d 503, 518 (Ala.Crim.App.1992), aff'd, 632 So.2d 543 (Ala.1993), this Court addressed the same issue, where the appellant claimed error by the trial court in denying her request to have the venire complete a questionnaire. This court stated that:
"`[T]he trial court has discretion regarding how the voir dire examination of [the] jury [venire] will be conducted, and... reversal can be predicated only upon an abuse of that discretion.' Bui v. State, 551 So.2d 1094, 1110 (Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). There was no abuse of discretion *467 by the trial court as to this matter."
Id. In the present case, the record clearly demonstrates an extensive questioning by the trial court and both counsel of prospective jurors, in panels and individually. There was no abuse of discretion by the trial court as to the voir dire procedures.

XVI.
The appellant argues that the trial judge improperly referred to his choice not to testify in violation of his right against self-incrimination under the Fifth and Fourteenth Amendments of the United States Constitution and under Alabama law. Specifically, the appellant refers to the trial court's sentencing order in which the trial court makes a reference to the fact that the appellant chose not to testify at either stage of his trial. The record indicates that the appellant failed to object to this inclusion before the trial court; therefore, any error must rise to the level of plain error. Rule 45A, Ala. R.App. P. However, a review of the sentencing order clearly indicates that the trial court was giving a factual recitation of the evidence and procedures at trial.
This statement made by the trial court is included in his statement of facts and was merely intended as such; there is no indication that he considered this fact further. As was the case in Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), in which the appellant had argued that the trial court had improperly considered nonstatutory aggravating circumstances citing to the sentencing order by the trial court, this Court, quoting Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), quoting in turn Rutledge v. State, 523 So.2d 1087, 1103 (Ala.Crim.App.1987), for the proposition that a "logical reading of the sentencing order" indicated that the trial court first made findings as to aggravating and mitigating circumstances and then considered the facts of the case and weighed the circumstances. Quoting Burgess and Rutledge again, this Court stated that "`the facts of this case support the court's statements, which we believe are merely the court's editorial comments on the evidence presented.'" Ferguson, 814 So.2d 925 at 958. As this Court found in Ferguson v. State, supra, the appellant's interpretation of the trial court's sentencing order in this case is "`strained and unrealistic.'" 814 So.2d at 958, quoting Burgess, 827 So.2d 183. We find no error by the trial court in recounting the fact that the appellant did not testify at trial or at sentencing in the trial court's findings of fact in his sentencing order.

XVII.
The appellant argues that because he was charged with two counts of capital murder, one of which he alleges was a lesser-included offense of the other, his rights against being placed in double jeopardy were violated. Specifically, he argues that the first count of the indictment, which charged him with committing murder during the course of a robbery, was a lesser-included offense of the second count of his indictment under which he was convicted of committing murder made capital because it was committed during the course of a kidnapping with the intent to commit a robbery.
Pursuant to § 13A-1-8(b)(1), Ala.Code 1975:
"When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"(1) One offense is included in the other, as defined in Section 13A-1-9...."
*468 A lesser-included offense is defined by § 13A-1-9, as follows:
"(a) A defendant may be convicted of an offense included in an offense charged. An offense is an included one if:
"(1) It is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged; or
"(2) It consists of an attempt or solicitation to commit the offense charged or to commit a lesser included offense; or
"(3) It is specifically designated by statute as a lesser degree of the offense charged; or
"(4) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interests, or a lesser kind of culpability suffices to establish its commission."
In the present case, the appellant was not convicted of an attempt or solicitation to commit an offense, as condemned in § 13A-1-9(a)(2); moreover, § 13A-5-40(a)(2), the capital offense of robbery-murder, is not defined by statute as a lesser-included offense to § 13A-5-40(a)(1), the capital offense of murder committed during a kidnapping, as condemned in § 13A-1-9(a)(3); these two forms of capital murder do not differ in that a less serious injury or risk of injury or a lesser culpability is required to establish its commission. § 13A-1-9(a)(4). Moreover, the capital offense of robbery-murder is not established by the same or fewer than all the facts required to establish the commission of the capital offense of murder-kidnapping. According to the commentary to § 13A-1-9(a)(1), this Code section "provides that a lesser offense is necessarily included in a charge of the greater offense if the proof necessary to establish the greater offense will of necessity establish every element of the lesser offense."
The first count of the indictment charged that the appellant:
"Did intentionally cause the death of Sharma Ruth Johnson, by shooting her with a shotgun, and Willie B. Smith caused the death at the time that [he] was in the course of committing a theft of Eighty Dollars of the lawful currency of the United States of America ... by the use of force of the person of Sharma Ruth Johnson, with intent to overcome her physical resistance or physical power of resistance while Willie B. Smith was armed with a deadly weapon ... in violation of § 13A-5-40(a)(2) of the Alabama Criminal Code."
The second count of the indictment charged that the appellant:
"Did intentionally cause the death of Sharma Ruth Johnson, by shooting her with a shotgun, and ... caused said death by the abduction or attempt to abduct, Sharma Ruth Johnson, with the intent to accomplish or aid the commission of robbery, a felony, or flight therefrom in violation of § 13A-5-40(a)(1) of the Alabama Code."
Thus, the appellant was charged with committing a robbery as an element of the first count; whereas the kidnapping element of the second count merely included the intention to commit a robbery as the intended felony when the victim was abducted. Therefore, the first count required proof of an actual robbery, while the second count did not. Thus, the elements of the offense charged in the first count were not included within the offense charged in the second count of the indictment.
Pursuant to § 13A-6-43(a), kidnapping in the first degree requires the abduction of another person coupled with *469 one of six different goals of criminal intent: to hold the victim for ransom; to use him as a shield or a hostage; to accomplish or aid in the commission of a felony or flight therefrom; to inflict injury or to abuse sexually the victim; to terrorize the victim or a third person; and to interfere with any governmental or political function. In the present case, the goal of the appellant's criminal intent in committing the abduction was to accomplish or aid in the commission of a felony, specifically, robbery. The commentary to this kidnapping statute states as follows:
"Note that none of the purposes listed in § 13A-6-43(a)(1)-(6) must be actually accomplished in order for the crime of kidnapping to be committed; the crime is complete when there is an `abduction,' i.e., intentional or knowing restraint, coupled with an intent to secrete or to hold the victim where he is not likely to be found, or use, or threaten to use deadly physical force. Section 13A-6-40(1) and (2). Proof of any one of the additional purposes increases the gravity of the offense. All of these criminal purposes pose substantial danger to the life of the victim or afford a strong incentive to kill him in order to avoid identification or apprehension."
Thus, because the intended purpose of the abduction need not be completed, while the felony of robbery was required to be completed in the first count, Count one was not a lesser-included offense of Count two, and the appellant's rights against double jeopardy were not violated.

XVIII.
The appellant argues that the double counting of robbery as an element of the capital offense and as an aggravating circumstance violated his right to an individualized sentence guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Specifically, the appellant argues that the trial court acted improperly by "double counting" the robbery as an element of the capital offense as well as an aggravating circumstance in his conviction and sentencing. However, this issue has previously been decided adversely to the appellant's argument. Tarver v. State, 500 So.2d 1232 (Ala.Crim.App.), aff'd, 500 So.2d 1256 (Ala. 1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Moreover, this action by the trial court did not result in double punishment for the same offense. Fortenberry v. State, 545 So.2d 129 (Ala. Crim.App.1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). See also Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

XIX.
The appellant argues that the highly prejudicial atmosphere at his trial violated his rights to due process, a fair trial, and a reliable sentencing determination. Specifically, the appellant cites the fact that the victim's family and friends "crowded the courtroom" and that the victim's brother, a Birmingham police officer, wore his uniform during the appellant's trial. He also cites to the fact that, when the jurors were given copies of the transcript of the tape recording of the appellant's conversation with Latonya Roshell, the victim's family members were also given a copy of this transcript. As to the sentencing phase, the appellant cites the fact that the trial court had to interrupt its instructions to the jury because a woman in the courtroom began crying. He also argues that the district attorney's closing argument highlighted the suffering of the victim and her family. This last claim has previously been addressed and determined to be meritless in this opinion. See Issue X.
*470 There was no error in allowing the victim's family and friends to be present in the courtroom.
"`To the contrary, the Alabama Crime Victims' Court Attendance Act, §§ 15-14-50 to 15-14-57, Ala.Code 1975, guarantees a victim or the victim's representative the right to be present in the courtroom and to be seated at the prosecution table. This right applies in capital cases. See Weaver v. State, 678 So.2d 260, 272 (Ala.Cr.App.1995), rev'd on other grounds, 678 So.2d 284 (Ala.1996). Moreover, this court has held on numerous occasions that a victim's family should not be excluded from the trial without a valid reason. See, e.g., Few v. State, 518 So.2d 835, 836 (Ala. Cr.App.1987), and cases cited therein.'

"Burgess v. State, 723 So.2d 742, 756-57 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).
"The decision whether to exclude persons from the courtroom during trial is a matter left entirely to the trial court's discretion. See Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)."
Taylor v. State, 808 So.2d 1148, 1200 (Ala. Crim.App.2000).
Moreover, there is no indication in the record that the appellant made any motion to close the courtroom or objected on this ground. Rule 45A, Ala. R.App. P. There was no abuse of discretion in the trial court's decision to allow friends and family of the victim to remain in the courtroom, and there was no plain error on this ground.
There was also no impropriety in the victim's brother wearing his uniform to trial. In Willis v. Kemp, 838 F.2d 1510 (11th Cir.1988), a murder victim's young son appeared at trial, and sat in the courtroom dressed in a copy of a police uniform.
"The victim's young son had been present in the courtroom throughout the day, dressed in a copy of a Ray City police uniform. Defense counsel asked the court to order the child removed from the courtroom. The court denied his request, noting that the trial was open to the public, including the victim's children, that the children had been present throughout the guilt and sentencing phases of the trial, and that they had behaved themselves properly....
"We see no error, much less a constitutional deprivation, in the trial court's ruling. Petitioner cites no authority for the proposition that due process requires that in a capital sentencing proceeding, the defendant has a constitutional right to have removed from the courtroom spectators whose presence may remind the jury of the victim. A criminal proceeding is a public hearing; all citizens, including the victim's family, have a right to attend."
Willis v. Kemp, 838 F.2d at 1523. See also State v. Munoz, 340 N.J.Super. 204, 774 A.2d 515 (2001) (a robbery victim, who as an active member of the United States Marines was required to wear his dress uniform when appearing in public, was properly allowed to wear his dress uniform while he testified). See also Hansen v. State, 592 So.2d 114 (Miss.1991) (the trial court properly held that the appellant was not entitled to an order prohibiting highway patrol officers from wearing their uniforms while sitting as spectators in the capital murder trial of a highway patrol officer). In the present case the victim's brother could properly attend the trial of his murdered sister in his police uniform.
*471 Although the appellant alleges that the trial atmosphere was saturated with preferential treatment for the victim's family as demonstrated by the fact that the family members were provided with copies of the transcript of the conversation between the appellant and Roshell at the same time the jury members were provided with such transcripts, there is no evidence indicating that the appellant suffered any prejudice as a result of the Court's treatment of the victim's family. In McDonald v. Delo, 897 F.Supp. 1224, 1240-43 (E.D.Mo.1995), the appellant argued that the trial court's conduct and its rulings evidenced its negative regard for the habeas petitioner, who had been convicted of capital murder and sentenced to death. Specifically, the petitioner in McDonald v. Delo, supra, argued that the trial court improperly admonished defense counsel to refrain from blocking the Court's view of the petitioner, revealing his prejudice against the petitioner; that it had improperly permitted various relatives of the victim to introduce themselves to the jury; that it had improperly permitted the victim's wife to testify to irrelevant matters; and that it had failed to prevent the victim's wife from displaying her grief to the jury. The federal court found no due process violations on the alleged grounds and noted that there had been no showing that these acts "prejudiced the jury in any manner, and there is certainly nothing to show that the trial was `fatally infected.'" Id. at 1242. Similarly, in the present case, there is no indication in the record that the appellant was prejudiced by the fact that the family members received a copy of the transcript. Moreover, defense counsel, in his closing argument at the guilt phase, used this fact as well as the fact that the victim's brother appeared at court in his uniform in order to argue to the jury specifics to fuel his claim that the appellant was being treated unfairly at trial as opposed to the preferential treatment being shown to the victim's family.
The appellant did not object at trial to any of the above claims concerning the biased atmosphere of his trial, and he has failed to show plain error on these grounds. Rule 45A, Ala. R.App. P.
Finally, the appellant argues that the biased atmosphere of his trial was further demonstrated in the sentencing phase when the trial court had to interrupt its instructions to the jury because a woman in the courtroom began weeping. The appellant admits in his brief to this Court the record is unclear whether the woman was a member of the victim's family. Again, the appellant failed to object on this ground and there is no evidence in the record that the jurors were distracted, disturbed, or in any way influenced by the woman's showing of emotion. Furthermore, the trial court instructed the jury to avoid any influences of passion, prejudice, or any other arbitrary factors during his subsequent instructions. "Generally, any misconduct or demonstration by a spectator during a criminal trial is not sufficient reason to grant a new trial, unless it appears that the rights of the accused were prejudiced. McNair v. State, 653 So.2d 320 (Ala.Cr.App.1992)." Smith v. State, 727 So.2d 147, 173 (Ala.Crim.App.1998), aff'd, 727 So.2d 173 (Ala.1999). See also Henderson v. State, 583 So.2d 276, 287 (Ala.Crim.App.1990) (this Court held that any prejudice caused by the outburst of crying by victim's family members at trial was eradicated by the trial court's prompt curative instructions to the jury).
In Crymes v. State, 630 So.2d 120, 123 (Ala.Crim.App.1993), defense counsel objected at trial to the fact that the murder victim's wife had been crying and that she eventually left the courtroom and was crying loudly in the next room. This Court *472 found no error in the trial court's denial of a motion for a new trial based on the alleged prejudicial conduct by the victim's wife. See also Crowe v. State, 485 So.2d 351, 362-63 (Ala.Crim.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986) (the murder victim's widow, who sat at the counsel table, cried during the pathologist's testimony, but the trial judge refused to remove her from the counsel table).
In the present case, as the appellant acknowledged in brief, the record does not indicate the identity of the woman who cried. There is no indication in the record that the woman disturbed the jury or distracted the jury in any manner. There was no plain error on this ground. Rule 45A, Ala. R.App. P.

XX.
The appellant argues that the trial court's refusal to answer a juror's question about what would happen if the jury became deadlocked improperly encouraged the jury to return a death sentence against him. The record indicates that, following the trial court's charge to the jury during the punishment phase of the appellant's trial, the trial court asked counsel if they had any objection to the charge, and the counsels all responded negatively. The trial court then asked the jury members if they had any questions and reminded them that he would be glad to address any such questions. A juror then asked the following: "What if we don't have a vote of seven on a life sentence?" The trial court responded as follows:
"You just have to communicate with me through the jury room door like you have been doing in the past. Let's just take things as they come."
No objection was made by the appellant to these instructions by the trial court; therefore, any claim must now be analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
Despite the appellant's argument to the contrary, there is no reasonable interpretation that can be made from these instructions by the trial court that would suggest that the judge was in any way encouraging the jury to return a sentence of death. The trial court was merely refraining from addressing problems that did not exist until the appropriate time. Clearly, in this way, the trial court sought to avoid any possible juror confusion. Moreover, the trial court properly instructed the jury that it should base its verdict solely on the evidence in the case. Because the juror asked a question that was not ripethe jury was not deadlocked as it had not yet retired to begin deliberationsto view the trial court's response to the question as prompting a sentence of death would be a "`strained and unrealistic' " interpretation of the trial court's statement. See Ferguson v. State, supra at 958. Moreover, immediately after responding to the juror's question, the trial court addressed the jury panel and asked whether the jurors would like to begin deliberations for a short time and then, because of the hour, break for dinner, or have dinner and then begin deliberations, stating, "You don't have to reach a verdict at any particular time." There was no plain error on this ground. Rule 45A, Ala. R.App. P.

XXI.
The appellant argues that the photographs of the victim's body were gruesome and that they served no purpose other than to prejudice the appellant. Specifically, the appellant refers to five photographs of the victim's body as it appeared during the autopsy examination introduced by the State. The appellant argues that *473 the photographs were irrelevant and cumulative and were accompanied by the "particularly gruesome descriptions of `the coroner's testimony.'"
However, as the appellant acknowledged in his brief, the photographs served to corroborate and elucidate the testimony of the pathologist as to the victim's wound, the cause of her death, and the proximity of the shotgun to the victim's head when she was shot. Thus, they were properly admitted. See, e.g., Whitley v. State, 607 So.2d 354 (Ala.Crim.App. 1992); Hawkins v. State, 594 So.2d 181 (Ala.Crim.App.1991); Hamilton v. State, 492 So.2d 331 (Ala.Crim.App.1986). In the present case, there was no reversible error due to the admission of these photographs.

XXII.
The appellant argues that the trial court erred in refusing to grant his request to strike for cause a certain veniremember. Specifically, the appellant argues that a veniremember's indication that she knew the facts of the case and that she was concerned about the case because she lived close to the crime scene and had two daughters who frequented the automatic teller machine where the crime occurred, demonstrated that she could not sit as a fair and impartial juror at trial. The appellant also argues that the same veniremember expressed a firm belief in the death penalty. The appellant argues that he attempted to question the veniremember further about her apparent biases and to explain to her the meaning of aggravating circumstances and mitigating circumstances, but the trial court did not allow him to do so.
The record indicates that during the voir dire examination of the entire venire, the trial court questioned the members as to pretrial publicity and informed them that, although he and the parties would speak privately to each potential juror who had been previously exposed to some form of prior knowledge of the facts or circumstances of the case, the Court wanted any jurors exposed to pretrial publicity to raise their hands. A large number of jurors so indicated. The trial court then instructed the jurors that they must be able to base their verdict on the evidence presented at trial and the law as explained to them; it further stated that if any of these potential jurors who had acknowledged that they had some information concerning the case would be unable to consider solely the law and evidence, they needed to raise their hand. He further stated that if anyone had formed some judgment concerning the ultimate question of guilt or innocence prior to the beginning of the trial, they should also so indicate by raising their hand. No one did so.
Thereafter, when the potential jurors were individually questioned pursuant to their response to the introductory voir dire, the veniremember cited by the appellant was brought into chambers for questioning. She was asked whether she could recall any details concerning the case, and she responded that she lived about four blocks from the site of the offense. She further stated that she had "some feelings" about the offense because she had two daughters, one of whom used the ATM machine that was the scene of the abduction. She was then asked if she had formulated any opinion as to the appellant's guilt or innocence and she responded, "Oh, no." She testified that she had simply taken an interest in the case because of its location and the safety implications for her family. She was then asked if she could be fair to the appellant and responded, "Yes." She further stated that her verdict would be based on the evidence presented at trial and would not be affected in any way by her own concern for her daughter's *474 safety. Defense counsel then questioned the potential juror as to her feelings concerning the death penalty; she indicated that she did "believe" in the death penalty. Defense counsel then asked if the present case was one on which she would feel compelled to return a death-penalty sentence, and she responded, "It would depend on how strong the evidence is, I think." The trial court then stopped defense counsel's questioning and indicated that if defense counsel wanted to pursue such questions, the potential juror should be informed concerning the meaning of aggravating circumstances and mitigating circumstances and how they apply to the weighing process of the sentencing phase. Therefore, the trial court instructed her briefly as to these matters and asked her if she would listen to the evidence and base her verdict as to punishment on the law and evidence, and she responded, "Oh, definitely." The trial court then stated that he believed that defense counsel was concerned that the location of the offense and the safety of her daughter might impede her ability to sit as a fair juror to which she responded, "Oh, no, I don't." Defense counsel then interrupted with the question but "[y]ou do believe very, very strongly in the death penalty? You believe, very strongly, in the death penalty?" The potential juror responded, "I believe in the death penalty. I wouldn't say strongly. In certain cases I do." Defense counsel then again attempted to ask her whether she would vote for the death penalty in the present case. The prosecutor objected, stating that the potential juror could not respond to the question as she had not yet been presented with the evidence of the case. The trial court agreed that the juror would be unable to respond to that question until she was aware of the evidence and that defense counsel had already asked the question to which she had responded as best she could. Defense counsel then moved that the juror be told what the aggravating circumstances and the mitigating circumstances would be in the present case. The trial court responded, "Well, I am not going to open that up, [defense counsel], to [potential juror.]" The trial court then stated that he had instructed the juror as best he could to the relevant law. The veniremember was then asked whether she had something she wished to say to which she responded negatively. Defense counsel moved that this veniremember be struck for cause, stating, "I don't think there's any question this is a woman that would sentence him to the electric chair at the drop of a hat." The trial court responded, "I don't see how you can say that ... in good conscious, I really don't."
A review of the questioning concerning this veniremember and her responses clearly indicates that, although she had some personal interest in the case based on its location and the implication of that location to her family's safety, the potential juror indicated that she would base her verdict on the evidence presented and attempt to be a fair juror.
"How far counsel may go in asking questions of the jury on voir dire, and the nature, variety, and extent of those questions are left to the discretion of the trial court. Dawkins v. State, 455 So.2d 220 (Ala.Crim.App.1984)." Ingram v. State, 779 So.2d 1225, 1262 (Ala.Crim. App.1999), aff'd, 779 So.2d 1283 (Ala.2000).
"`"It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court."` Smith v. State, 581 So.2d 497, 503 (Ala.Crim.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). See also Johnston v. State, 497 So.2d 844, 849 (Ala.Cr.App. *475 1986) (a juror `is not disqualified if he states that he can find a true verdict on the evidence alone'); and Stringfellow v. State, 485 So.2d 1238, 1241 (Ala.Cr.App. 1986) (a juror who stated that she would `try real hard' to put her personal bias aside was not due to be dismissed for cause)."
Whitehead v. State, 777 So.2d 781, 810-11 (Ala.Crim.App.1999) aff'd, 777 So.2d 854 (Ala.2000).
In the present case, there was no indication of bias toward the appellant by this potential juror; therefore, no error resulted in the trial court's denial of the challenge for cause. Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000); Hyde v. State, supra; Willie Burgess v. State, supra; Kinder v. State, 515 So.2d 55 (Ala.Crim.App.1986).

XXIII.
The appellant argues that the trial court erred by denying his motion for a change of venue because, he says, he demonstrated actual prejudice to him during voir dire. Specifically, the appellant submits that 28 venirepersons admitted they had some knowledge of the case, and several had extensive knowledge of the facts including the fact that the victim was a police officer's sister. However, although a number of venirepersons admitted that they had some knowledge of the case, none of the actual jurors who sat on the case had stated on voir dire that they had any prior knowledge of the facts of this case. Therefore, the appellant has demonstrated no actual prejudice.
"The burden is on a defendant seeking a change of venue to show, to the reasonable satisfaction of the court, that he or she cannot receive a fair and impartial trial in the county of original venue. Motions for a change of venue are addressed to the sound discretion of the trial court and its decision on such a motion will not be disturbed on appeal except for an abuse of that discretion."
Acklin v. State, 790 So.2d 975, 997 (Ala. Crim.App.2000), writ denied, 790 So.2d 1012 (Ala.2001).
There are two situations that would require a change of venue: one dealing with pretrial saturation of the community; the other requiring actual jury prejudice or "`"`"a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice." McWilliams v. United States, [394 F.2d 41 (8th Cir.1968)].'"'"" Hyde v. State, 778 So.2d 199, 232 (Ala.Crim.App.1998). The appellant's claims address the situation requiring a showing of actual prejudice.
"`"A criminal defendant is not constitutionally entitled to trial by jurors ignorant about relevant issues and events.... `The relevant question is not whether the community remembered the case, but whether the jurors... had such fixed opinions that they could not judge impartially the guilt of the defendant.' ... In determining the existence of presumptive prejudice, a court must consider the totality of the circumstances, including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case.... We note that `the presumptive prejudice standard... is only "rarely" applicable ... and is reserved for an "extreme situation." `... `In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial *476 jury is an extremely heavy one.'"
"`United States v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir.), cert. denied, 506 U.S. 924, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).
"`Our review convinces this Court that the trial judge did not abuse his discretion in denying the motion for a change of venue.
"`"`The trial court's findings of impartiality should be overturned only for "manifest error." Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).' Fortenberry v. State, [545 So.2d 129 (Ala.Cr.App.1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)]. `Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).' Ex parte Grayson, 479 So.2d [76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)]. We find no abuse of discretion by the trial court or manifest error in his finding of impartiality."
"`Oryang v. State, 642 So.2d 979 (Ala. Cr.App.1993) (every member of venire indicated that they had been exposed to pretrial publicity). See also Thomas v. State, 539 So.2d 375, 394 (Ala.Cr. App.) ("[a]t the beginning of voir dire, every member of the venire stated he or she had read or heard about this case"), affirmed, 539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Here, as in Thomas, 539 So.2d at 395, the appellant has "failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice."`

"Smith v. State, 646 So.2d 704, 706-07 (Ala.Crim.App.) (where every veniremember acknowledged having heard of the capital offense), cert. denied, 646 So.2d 704 (Ala.1994). See also Holladay v. State, 549 So.2d 122, 126 (Ala.Crim. App.1988) (`The fact that virtually every prospective juror had some knowledge of the appellant's case does not mean the appellant could not receive a fair and impartial trial.'), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989)."
Hardy v. State, 804 So.2d 247, 292-93 (Ala. Crim.App.1999).
In the present case, the appellant failed to meet his burden of proof as to actual prejudice. He failed to show that he could not receive a fair trial and, in fact, none of his actual jurors indicated they had any previous knowledge of this case.

XXIV.
As is required by § 13A-5-53, Ala.Code 1975, this Court must review the propriety of the appellant's conviction and his sentence of death by electrocution. The appellant was convicted of capital murder pursuant to § 13A-5-40(a)(2) and § 13A-5-40(a)(1), Ala.Code 1975. A review of the record reflects that the appellant's sentence to death was not the result of any influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court properly found the existence of the following aggravating circumstances: that the murder was committed while the appellant was engaged in or was an accomplice in the commission of a robbery, and that the murder occurred while the appellant was engaged in or was an accomplice in the commission of a kidnapping. *477 The trial court properly found the existence of two mitigating circumstances: that the appellant had no significant history of criminal activity, and the age of the defendant at the time of the crime; specifically, that he was 22 years and 25 days old at the time of the offense. The trial court also properly considered nonstatutory mitigating circumstances; the trial court made lengthy findings of such evidence which he considered. Summarily, the trial court stated:
"I find that the defendant's luckless childhood and troubled adolescence occasioned in large part by an abusive father, economic deprivations affecting the defendant's family, the defendant's verbal I.Q. of 75, classified as the borderline range between mild retardation and low-average intelligence, this position of co-defendant's cases for the lesser offense of murder are all relevant factors to be considered in mitigation of the sentence."
According to § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating and mitigating circumstances. We have weighed all of the evidence presented in support of the aggravating and mitigating circumstances and are convinced that the appellant's sentence to death is appropriate and that the aggravating circumstances outweigh the mitigating circumstances.
As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must also determine whether the appellant's sentence is disproportionate to the penalties imposed in similar cases. The appellant's sentence is neither disproportionate nor excessive. For death sentences imposed on convictions of robbery-murder, see, e.g., Kuenzel v. State, supra; Henderson v. State, supra; Davis v. State, 718 So.2d 1148 (Ala.Crim. App.1997). For cases involving the imposition of the death penalty on conviction of murder during kidnapping in the first degree, see, e.g., Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001); Duncan v. State, 827 So.2d 838 (Ala.Crim.App.1999), aff'd, 827 So.2d 861 (Ala.2001); Baker v. State, [Ms. CR-95-0292, Jan. 12, 2001] ___ So.2d ___ (Ala.Crim.App.2001).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala. R.App. P.
The judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB and WISE, JJ., concur.
SHAW, J., concurs in the result.
COBB, J., concurs in part and dissents in part, with opinion.
COBB, Judge, concurring in part and dissenting in part.
I concur with the majority's disposition of all issues except the issue discussed in Part I of its opinion. As to that issue, I must dissent.
Philosophically, I am in agreement with the majority. I continue to question the propriety of the United States Supreme Court's decisions in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny, and the decisions of the Alabama Supreme Court applying those cases. Nevertheless, this Court is obliged to follow existing precedent, and the law now provides that an explanation based on group bias, when the group trait has not been shown to apply to the specific juror who was struck, is evidence that the reason given for striking a juror was a pretext for discrimination. E.g., Walker v. *478 State, 611 So.2d 1133, 1141 (Ala.Crim.App. 1992); Giles v. State, 815 So.2d 585, 587 (Ala.Crim.App.2000).
In Walker, this Court addressed the issue now before us. We stated:
"We further find that the reasons for two other strikes were not race neutral under the circumstances before us: veniremember no. 68 because she was a minister's wife and veniremember no. 123 because he was `very religious.' These veniremembers did not respond when asked whether they had a fixed opinion against the death penalty or whether they not being absolutely opposed to it, `just [did not] like it,' or when asked whether any veniremember had `a personal, religious or moral conviction against passing judgment on [his] fellow man.' `[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically' is evidence that the reason was a sham or pretext. [Ex parte] Branch, 526 So.2d [609, 624 (Ala.1987)](quoting Slappy v. State, 503 So.2d [350, 355 (Fla. Ct.App.1987)]; noting as an example `an assumption that teachers as a class are too liberal, without any specific questions having been directed to ... the individual juror showing the potentially liberal nature of the challenged juror'). See also Williams v. State, 548 So.2d 501, 507-08 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989) (wherein the court noted that strikes based on age-based bias, residence-based bias, and employment-based bias, without any voir dire examination in reference to these biases, raise a strong inference of discrimination). `"Group-based" strikes without "examination of [the] juror apparent in the record to determine any further information about the juror and the juror's competency to serve" caused our Supreme Court "great concern."` Parker v. State, 568 So.2d [335, 337 (Ala.Cr.App. 1990)] (quoting Branch, 526 So.2d at 626 n. 13).... The prosecutor could have easily dispelled any doubt, had there been any, by asking a follow-up question specifically of each veniremember. He cannot, however, presume that, in the absence of a response to specific voir dire questioning as to whether the veniremember is in fact opposed to the death penalty, the veniremember would not vote in favor of the death penalty simply because the veniremember is very religious, is a minister or minister's wife, or even is a member of a particular denomination."
611 So.2d at 1140-41.
The record in this case discloses that the prosecutor struck several women because they indicated that they had close affiliations with various churches. The trial court noted in its order on return to remand that the prosecutor "feared that these prospective jurors would be more susceptible to the troubled youth/adolescent argument." (S.R.22.) The trial court further stated that the prosecutor explained that he struck jurors who had strong church affiliations because he was afraid that "church oriented people" would be more receptive to a mercy argument than would other veniremembers. (S.R.19.) However, the prosecutor asked no follow-up questions. There is no indication in the record that the church affiliations of any of the jurors would have impacted the ability to sit as a juror in this case. There is certainly nothing in the record to support the prosecutor's presumption that the church affiliations would make the jurors more receptive to a mercy argument. It might be equally presumed that a religious person would be more susceptible to the arguments in favor of capital punishment, as indicated by a juror *479 in Price v. State, 725 So.2d 1003, 1025 (Ala.Crim.App.1997):
"`[DEFENSE COUNSEL]: When you say an eye for an eye and a tooth for a tooth, you feel like you take a life, your life should be taken?
"`PROSPECTIVE JUROR: That's what the Bible says.
"`[DEFENSE COUNSEL]: That's a strong religious conviction that you hold?
"`PROSPECTIVE JUROR: That's what I've always been taught.'"
725 So.2d at 1023.
As we observed in Giles, "This is precisely the type of action we found in Walker to be prohibited, and to constitute reversible error." 815 So.2d at 588.
The extensive order filed by the trial court on remand demonstrates that the court went to great lengths to uphold the prosecution's peremptory strikes. The trial court's assertion that the prosecutor "is certainly not a person prone to strike minorities "is not helpful to our resolution of this issue, however, because women are not a minority in the United States. The order might be sufficient to persuade some that the denial of the Batson motion was not clearly erroneous.
The prosecution's use of 14 of its 15 peremptory challenges to remove women from the venire is strong evidence that the State intended to exclude qualified women from serving on the jury. Due to the lack of voir dire questioning on the effect of the veniremembers's religious beliefs and church affiliations on their "susceptibility to mercy arguments" or on their ability to decide the case on the law and the facts, we are left only with the indication that the prosecutor struck on the basis of group bias unsubstantiated by anything in the record before us. I must conclude that the trial court's denial of Smith's Batson motion was clearly erroneous. Based on the existing law that this Court is bound to follow, Smith's conviction should be reversed, and the cause remanded for a new trial.
Therefore, I dissent.
NOTES
[1] During the prosecutor's discussion concerning his reasons for the strikes, he referred to one potential juror, stating that he believed that she may have been an individual who seemed eccentric. The prosecutor, however, affirmed that he struck her because of her role as a church volunteer, a Sunday school teacher, and a volunteer for the Red Cross; he stated, "and, I don't want everybody to be normal, I just want a good cross-section of the jury." The trial court then asked, "She falls into the church category?" And the prosecutor responded, "Yes, sir, basically."
[2] The prosecutor gave as reasons for his striking of juror no. 74 that she was a law student and that she knew both defense counsel and the prosecutor. Although he also gave as a reason that this potential juror was a Sunday School director, the record indicates that this potential juror never stated that she was a director of Sunday School, while another potential juror made this claim in response to a question by defense counsel.
[3] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[4] To the extent that Walker v. State, supra, held that such religious based reasons were not facially race neutral, it is overruled.